**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **MIA TOMASELLO, on behalf of herself and all others similarly situated,** | |
| *Plaintiffs*, | **Civil Action No. 23-3759** |
| v. | **OPINION** |
| **ICF TECHNOLOGY, INC., and ACCRETIVE TECHNOLOGY GROUP, INC.,** | |
| *Defendants*. | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Plaintiff Mia Tomasello's ("Tomasello" or "Plaintiff") Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23. See ECF No. 49 (the "Motion"). Plaintiff performed on a live, adult chat website and claims that she and other class members are misclassified as independent contractors. See generally ECF No. 29 ("Am. Compl."). They seek wages for uncompensated time working in a "free chat" area and for earned tips. Id. Defendants ICF Technology, Inc. ("ICF") and Accretive Technology Group, Inc. ("Accretive," and with ICF, "Defendants") oppose the Motion. See ECF No. 57 ("Opp'n Br.").

For the reasons set forth below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

Plaintiff brings this putative class and collective action against Defendants, alleging violations of the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) ("FLSA") (Count I), the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, et seq. ("NJWHL") (Count II), and the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1, et seq. ("NJWPL") (Count III & Count IV). See

generally Am. Compl.

Plaintiff purports to represent a class of "[a]ll persons who, at any time from August 6, 2019 continuing through entry of judgment in this case, worked as Performers for [ICF] and/or [Accretive] in New Jersey and were classified as independent contractors under their Performer Agreements" (collectively, "Performers," and individually, "Performer").[1]  See ECF No. 51 ("Cert. Mot.") at 1; see also Am. Compl. ¶¶ 63–71.  Plaintiff claims that Defendants have unlawfully misclassified Performers as "independent contractors," not employees, thereby denying them "the right to be paid the minimum wage and the protection against illegal deductions from pay."  Am. Compl. at 2.

## A.    Streamate and its Performers

Defendants operate a streaming website under the name Streamate.com ("Streamate"), which provides live adult entertainment to potential customers.[2]  See, e.g., ECF No. 30 ¶ 9 ("Answer").    Streamate serves as a host website for livestreaming and/or disseminating adult-oriented content for Performers, who must "register" for the website and execute a "Performer Agreement" prior to streaming content.  See, e.g., Kocher Decl., Ex. B (containing six (6) versions of Performer Agreements) at DEF_000001, ECF No. 49.4.  "The [Performer] Agreement contains details and explanations regarding our strict policies and requirements concerning no minors; no prostitution or sex-trafficking; age verification; uploading of Content; conditions for you giving performances; and other very important matters."  Id.; see also

---

[1] According to Plaintiff, Defendants have confirmed that this putative class consists of approximately 281 members.  See Kocher Decl., ECF No. 49.2 ¶ 11.  The parties have more recently notified the Court that as of February 26, 2025, the FLSA collective action class totals approximately eleven (11) members.  See ECF No. 89 at 1.

[2] More specifically, ICF is a corporation organized under the laws of Washington that "operates a number of online social media platforms . . . [sharing] adult content on websites" like Streamate.  Compare Am. Compl. ¶ 2, with Answer ¶ 2.  Accretive is a corporation organized under the laws of Washington that "owns more than 10% of ICF's stock."  Compare Am. Compl. ¶ 3, with Answer ¶ 3.  ATF advertises itself as "a market leader in web-based live video streaming."  Id.

infra § I.C.

Any individual who seeks to register as a performer must certify that they are eligible. See, e.g., Kocher Decl., Ex. B at DEF_000005; Rekevics Decl. ¶ 3, ECF No. 57.8. The applications are reviewed by Defendants to confirm applicants' compliance with, among other things, minimum age requirements and legality to perform and stream adult-oriented content in their respective locations of residence. Id.

Following applicant verification and execution of a Performer Agreement, Performers may begin accessing, uploading, and/or streaming on Streamate. Answer ¶ 17. Potential customers can visit Streamate's home page—which depicts photograph thumbnails of then-online Performers—without paying for immediate access. See, e.g., Rekevics Decl. ¶ 4. Potential customers may browse Streamate's homepage, which contains the collection of photograph thumbnails, or utilize Streamate's search functions to search for Performers by keywords or categories. See, e.g., id.; see also Am. Compl. ¶ 11 (citing https://streamate.com/support/faq). From there, a potential customer may begin viewing a Performer's livestream and/or uploaded content. Id.

**B.  "Free Chat" and "Paid Chat"**

Performers may generally engage with potential customers in one of two ways: "free chat" or "paid chat." See Rekevics Decl. ¶¶ 4–5. Upon clicking on a specific Performer to view and/or interact with, a potential customer is brought to that Performer's "free chat" area. See, e.g., id. ¶ 4. A Performer's free chat area displays a live-streamed video of that Performer and allows a potential customer watching the live-streamed video to interact with the Performer. Id. A potential customer who accesses a specific Performer's free chat area is not required to pay for viewing a Performer's livestream or interacting in the Performer's chatroom. Id. But a potential customer

who is viewing a Performer's free chat area may give that Performer "Gold,"[3] which is Streamate's "virtual currency." See, e.g., id.; Rekevics Dep. Tr. at 69:18–24, ECF No. 49.3; Opp'n Br. at 4–5, 10. Customers exchange real money for this virtual currency at an exchange rate of 1:1. See Rekevics Decl. ¶ 4 n.1; Opp'n Br. at 10.

Giving Gold may signify several things, but it is first and foremost a form of payment to Streamate and to the Performer. Id. When a customer gives Gold to a Performer, Streamate and the Performer share the revenue in U.S. dollars at an agreed-upon percentage pursuant to the terms of the applicable Performer Agreement. See, e.g., Kocher Decl., Ex. B at DEF_000016; Rekevics Dep. Tr. at 66:6–15, 74:11–15. According to Defendants, a Performer who is given Gold would receive approximately 35% revenue share of the Gold transaction, while Streamate would receive approximately 65% from the same transaction.[4] See Rekevics Dep. Tr. at 66:6–15.

It is undisputed that Streamate does not compensate Performers for time that they spend in their free chat area. See, e.g., Answer ¶ 15. Performers' only means of receiving compensation while in their free chat area are through Gold payments, subscription payments, or other content purchases made while in free chat. Compare id., with id. ¶ 33; see also Rekevics Decl. ¶ 4. If Gold is not earned, Performers receive no compensation for time spent in the free chat. See generally id.

Performers earn Gold by performing certain actions for set pricing, selling content for set pricing, and receiving Gold as a form of gratuity. Free chat incorporates several features that are designed to increase customer engagement and Gold payments to Performers during time spent in

---

[3] Plaintiff argues that the act of giving Gold is equivalent to the act of tipping. See Cert. Mot. at 6–7; Pls.' Reply, ECF No. 64 at 14–15. Defendants disagree with this characterization, see Opp'n Br. at 10, but ultimately concedes that a customer may give Gold as a form of tip or gratuity, id. at 35–36.

[4] But see Kocher Decl., Ex. B at DEF_000004 ("[Performers] have the right to negotiate with [Streamate their] percentage split of revenues from live performances."). However, neither party has provided this Court with proof that any Performer receives more than 35% from a Gold transaction.

free chat.  See Rekevics Decl. ¶ 4.  The incorporation of these features is at the sole discretion of the Performers.  See id.  For example, a Performer may or may not choose to utilize a "Gold Menu," a "spin-the-wheel" program, and/or an interactive sex toy option—all of which are at base designed and offered by Defendants.  See id.  If a Performer chooses to utilize a Gold Menu feature, that Performer chooses certain "actions" that the Performer will perform once the threshold price listed on the Gold Menu is fulfilled.  Id.  The Performer sets the price(s) for the various actions that they make available, although pricing structure is allegedly recommended by Defendants.  Id.; A.T. Decl. ¶ 4, ECF No. 57.9; W.G. Decl. ¶ 4, ECF No. 57.10; see also Tomasello Dep. Tr. at 224:6–225:4, ECF No. 49.6 (testifying that Streamate "give[s Performers] more traffic and more work if [they] base [their] rates on [Streamate's] suggestions").

If a Performer chooses to utilize a spin-the-wheel program, a customer pays the Performer for an opportunity to spin a digital wheel, which contains certain "actions" that the Performer will do if the spin lands on that area of the wheel.  See Rekevics Decl. ¶ 4.  Here, the Performer sets the price for spinning the wheel.  Id.; see also W.G. Decl. ¶ 4.  Performers may also permit customers to pay a certain rate set by the Performers to activate "Bluetooth-compatible interactive sex toys."  Rekevics Decl. ¶ 4.  Outside of these optional free chat features, Performers may earn Gold in free chat through the sale of uploaded content—prerecorded videos or photos.  Rekevics Decl. ¶ 4; W.G. Decl. ¶ 4; A.T. Decl. ¶ 5.  Lastly, Performers may earn Gold in free chat by being paid directly from the customer," which Defendants admit resembles a "tip" or "gratuity."  Opp'n Br. at 35–36.

Streamate tracks many Gold transactions—payments made as gratuities, Gold Menu payments, and spin-the-wheel payments.  See, e.g., Rekevics Decl. ¶ 4; Opp'n Br. at 4–5, 35–36. But Streamate does not track Gold spent for interactive toy payments or for the purchase of content.

Id.  Outside of a Performer's free chat area, potential customers can interact with Performers by initiating a "paid chat."  Rekevics Decl. ¶¶ 4–5.  "Paid areas either include a pay-per-minute or flat rate payment schemes for customers to view performances."  Rekevics Decl. ¶ 5.  Each Performer can require potential customers to pay a certain amount of Gold before being allowed access to a Performer's paid chat.  See, e.g., Rekevics Decl. ¶ 5; W.G. Decl. ¶ 3; A.T. Decl. ¶ 5.  Performers can set their own rates for entry into paid chat.  See, e.g., id.  When a Performer enters paid chat, they are not viewable in their free chat area.  Rekevics Decl. ¶ 5

Streamate only compensates its Performers for the time that they spend in paid chat.  Answer ¶¶ 33, 35.  As a result, Streamate tracks a Performer's "total minutes online" and their "total paid minutes" online.  Id. ¶ 45.  However, it is not clear from the record how or how much Streamate compensates Performers for their time spent in paid chat—only that Performers and Streamate share the revenue derived from every Gold transaction at an agreed-upon rate.  See, e.g., Rekevics Dep. Tr. at 66:6–15; Kocher Decl., Ex. B at DEF_000004.

### C.    Written Rules and Policies

Performers are bound by the terms of their Performer Agreements, which Streamate may terminate at its "sole discretion for any reason whatsoever."  See, e.g., Kocher Decl., Ex. B at DEF_000007.  Plaintiff provides the Court with six (6) nearly identical versions of Performer Agreements, which appear to span from April 1, 2020, to August 2, 2022.  See id. at DEF_000016–21 (last amended Apr. 1, 2020); id. at DEF_000022–27 (last amended Sept. 2020); id. at DEF_000028–35 (last amended Sept. 15, 2021); id. at DEF_000036–44 (last amended May 10, 2022); id. at DEF_000001–9 (last amended Aug. 2, 2022); id. at DEF_000045–53 (last amended Aug. 2, 2022).  Two versions of the Performers Agreement contain mandatory arbitration provisions, which requires that "[a]ny controversy or claim arising out of [the Performer

6

Agreement], Performer/Studio's performance of this [Performer Agreement], or to the parties' other actions in any way relating to any subject matter of [the Performer Agreement] shall be filed with and settled by final and binding arbitration in accordance with the then-current arbitration procedures of the American Arbitration Association." See id. at DEF_000020; id. at DEF_000026. In addition, the mandatory arbitration provisions in both versions of the Performer Agreements contain a waiver of class and collective actions. See id. at DEF_000020; id. at DEF_000027 ("Performer/Studio and Streamate intend and agree that class, collective, and representative action procedures are hereby waived and shall not be asserted, nor will they apply, in any arbitration pursuant to this agreement.").

The Performer Agreements require Performers to comply with certain conditions, violations of which may result in disciplinary measures including, without limitation, suspension or termination of a Performer's livestream or Streamate account. For example, the Performer Agreements prohibit Performers from displaying "below the waist nudity" in free chat areas. Id. at DEF_000005. Performers are also prohibited from promoting "non-Streamate related website[s]." Id. In other words, a Performer may not promote their presence or performances on other websites. Performers may not be under the influence of illegal drugs or alcohol while livestreaming or in uploaded paid-for content. Id. Performers may not display "any animal[s], firearm[s], or gun[s] of any type" during a livestream or in paid-for content. Id. A "Performer shall not engage in any type of fraudulent activity," which the Performer Agreement defines as "any activity that violates any law, that results in complaints or chargebacks, or that is deemed inappropriate by us." Id. The Performer Agreement does not further define what may constitute "inappropriate."

Defendants "approve[] images submitted by [P]erformers to their biographies that appear

on Streamate." Answer ¶ 21. Streamate also reviews all content submitted for uploading prior to it being publicly viewable. See Kocher Decl., Ex. B at DEF_000003. Streamate may block content from being uploaded if any content is deemed illegal or in violation of the Performers Agreement. Id. As to Streamate's capabilities to review livestreamed content, Streamate can monitor livestreamed content in real-time and may block and/or remove such content if Streamate deems it illegal or in violation of the Performers Agreement. Id. at DEF_000004.

Streamate owns any content that a non-California resident Performer uploads to Streamate. Id. at DEF_000005–6. As a result, Streamate has "the sole discretion to use any such [u]ploaded [c]ontent in any way it so chooses, including but not limited to in any medium and in any promotion, distribution, advertising, sales, or marketing efforts, both during and after the term[s] of" the Performers Agreements. Id. at DEF_000006.

Streamate also provides Performers a "Streaming Rules FAQ," which seeks to clarify "streaming rules and how they are enforced." Kocher Decl., Ex. F at DEF_000701; see also Opp'n Br. at 28 ("[T]he FAQ merely explains the pre-existing rules and policies established by the Performer Agreement."). The Streaming Rules FAQ clarifies that certain rules under the Performers Agreement are considered "no tolerance" rules, meaning that one violation of said rule will result in a Performer's removal from Streamate. See Kocher Decl., Ex. F at DEF_000701. For example, Streamate has "no tolerance" for depictions of underage or non-consensual roleplay and displaying such content will result in the Performer's immediate removal from Streamate. See id. at DEF_000702. Other violations of the Performers Agreement are reviewed using a "loose three-strike" policy, meaning that certain violations will result in a warning or temporary suspension, but a third violation will result in the offending Performer's removal from Streamate. See id. at DEF_000704–6. For example, Streamate classifies its "no animals" rule as reviewed

under its three-strike system.  See id. at DEF_000705.

In addition to these written rules, Plaintiff claims that Defendants "direct" or encourage Performers' stylistic choices in furtherance of helping to attract viewers.  See Cert. Mot. at 5–6 (citing ECF No. 49.7).  For example, Performers may access and review an October 30, 2023, guide entitled "Developing Your Style," which offers non-mandatory suggestions for "stand[ing] out."  See ECF No. 49.7.  Some of these suggestions include adding special interests or kinks to a Performer's profile, adding "professional photos and smooth HD video[s]," utilizing lingerie, costumes, and toys, and taking customer requests.  See id.  But this guide also permits a Performer's autonomy over their livestream.  See generally id.

## D. Plaintiff's Experience

Plaintiff is a resident of Jersey City, New Jersey, and has worked as a Performer for Defendants from 2016 to the present.  Am. Compl. ¶ 1.[5]  Following her registration with Streamate and execution of the Performer Agreement, Plaintiff began livestreaming adult content.  Id. ¶ 10.  Plaintiff first started streaming for Streamate while she was located in Florida.  See Tomasello Dep. Tr. at 139:4–11.  After some time, Plaintiff relocated to New Jersey.  Id.  Plaintiff also recalls streaming from South Carolina and New York.  See id. at 261:4–9.

To stream with Streamate, Plaintiff purchased certain equipment, including a computer, webcam, and internet connection.  Am. Compl. ¶ 27; see also Answer ¶ 26 (admitting that all Performers must purchase or own for use "technology needed to process data (a computer), stream video (a webcam), and the internet (an internet connection).").  Defendants did not reimburse Plaintiff for these purchases, and do not reimburse Performers for the same.  Am. Compl. ¶ 27.  In

---

[5] There is conflicting testimony as to when Plaintiff first began working for Streamate.  In her Amended Complaint, Plaintiff asserts that she has worked as a Performer for Defendants beginning in 2016.  See Am. Compl. ¶ 1.  But Defendants believe that Plaintiff "first registered an account on Streamate in 2010."  Answer ¶ 1.  Plaintiff herself testified that she "streamed for Streamate" from 2009 to the present.  Tomasello Dep. Tr. at 139:12–16.

preparing to work for Streamate, Plaintiff also purchased other "work-related things," like costumes. Tomasello Dep. Tr. at 135:13–19.

Streamate concedes to tracking Plaintiff's "total minutes online" and their "total paid minutes online." Answer ¶¶ 16, 45. As an example of this, Plaintiff provided metrics for compensation received compared to hours worked. Am. Compl. ¶¶ 37–41. During the week of January 15, 2023, for example, Plaintiff was online for approximately 170 minutes but was only paid for 72 minutes. Answer ¶ 37. And while Performers are free to set their own monetary rates, they do so "[u]nder the influence of what Streamate suggest[s]." Tomasello Dep. Tr. at 149:16–19.

According to Plaintiff, "there[ are] a lot of rules that [a Performer has to] follow with Streamate," Tomasello Dep. Tr. at 71:21–22, violations of which may prompt a Performer's suspension or termination from Streamate. Plaintiff recalls Streamate suspending her "for about a week because [she] wasn't performing tasks up to par according to . . . their standards." Id. at 41:5–20. Plaintiff received notice of her suspension via e-mail and guesses that Streamate's reason for suspension was that she "wasn't engaging enough with the customers." Id. Plaintiff also recalls that Streamate suspended her for not "performing to [Streamate's] liking" during paid chats. Id. at 126:13–127:11. Plaintiff has also received "disciplinary warning[s]" from Streamate for "promoting herself" on other social media platforms, among other things. Id. at 46:6–11, 128:22–24. According to Plaintiff, Streamate "has a rule about posting content from other companies," among other rules. See, e.g., id. at 45:19–46:4.

Plaintiff's content remains uploaded and available for viewing on Streamate, see id. at 68:16–19, but Plaintiff has since ceased livestreaming on Streamate because she feels as though Streamate is "too demanding and [doesn't] pay enough," see id. at 123:18–124:10. By too

demanding, Plaintiff asserts that Streamate has "too many rules." Id.

## II.    PROCEDURAL HISTORY

On July 13, 2023, Plaintiff filed an initial Complaint in the United States District Court for the District of New Jersey on behalf of herself and all others similarly situated against Defendants. See generally ECF No. 1.   On December 28, 2023, Plaintiff filed the operative Amended Complaint, which alleges that Defendants have violated and continue to violate the FLSA and various related New Jersey wage laws on behalf of herself and a putative class.   See Am. Compl. ¶¶ 72–115.  On February 9, 2024, Plaintiff moved for conditional certification under 29 U.S.C. § 216(b) of the collective action.  See ECF No. 31.  On August 8, 2024, the Court granted conditional certification for the purposes of collective action under the FLSA a class of

> [a]ll current and former individuals who work or have worked as Performers for [ICF] and/or [Accretive] in the state of New Jersey at any time three (3) years prior to the filing of this action through the entry of judgment in this action, and who elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b).

See ECF No. 48 (citing Am. Compl. ¶ 56).

On August 9, 2024, Plaintiff moved for certification under Federal Rule of Civil Procedure 23 for a class of

> [a]ll persons who, at any time from August 6, 2019 continuing through entry of judgment in this case, worked as Performers for [ICF] and/or [Accretive] in New Jersey and were classified as independent contractors under their Performer Agreements.

See ECF No. 49 at 2; Cert. Mot. at 1.  Defendants oppose.  See generally Opp'n Br.  On September 4, 2024, the Court authorized the method, timing, and content of notices to putative members of the FLSA collective action.  See ECF No. 61.  Since that time, the opt-in period for the FLSA collective action has closed.  See, e.g., ECF No. 89.  Discovery remains ongoing.

## III.    LEGAL STANDARD

"In order to be certified, a class must satisfy four requirements of Rule 23(a): (1)

numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 308–09 (3d Cir. 1998); see also Fed. R. Civ. P. 23(a). Once those requirements are met, the Court considers whether the class can be maintained under one of the provisions of Rule 23(b). See Ferreras v. Am. Airlines, Inc., 946 F.3d 178, 182 (3d Cir. 2019). Here, Plaintiffs seek certification under Rule 23(b)(3), which allows for a class action where "questions of law or fact common to class members predominate over any questions affecting only individual members . . . [and] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Third Circuit has also recognized an "implicit ascertainability requirement," Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015), which the Court must consider "[p]rior to determining whether the requirements of Rule 23 have been met," Carney v. Goldman, No. 15-260, 2018 WL 2441766, at *10 (D.N.J. May 30, 2018). A class is ascertainable if: (1) it can be "defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Byrd, 784 F.3d at 163 (internal citations and quotation marks omitted). This ascertainability requirement must be demonstrated under the same "rigorous" standards provided for by Rule 23, which requires a plaintiff to present "evidentiary support" that the proposed method of ascertaining a class will succeed. See Carrera v. Bayer Corp., 727 F.3d 300, 306–09 (3d Cir. 2013).

A plaintiff "must affirmatively demonstrate" that Rule 23's requirements are satisfied, see Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011), by a preponderance of evidence, see In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015). In deciding whether to certify a class, the Court's analysis frequently overlaps with "the merits of the plaintiff's underlying claim[s]," Dukes, 564 U.S. at 351, but the Court may consider the merits "only to the

extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied," Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013).

IV.    ANALYSIS[6]

    A.    **Ascertainability**

As previously noted, a class is ascertainable if: (1) it can be "defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Byrd, 784 F.3d at 163 (internal citations and quotation marks omitted).

Here, Defendants do not appear to challenge class certification on ascertainability grounds. See generally Opp'n Br. Regardless, the Court is satisfied that this requirement is met. Plaintiffs seek to certify a class of all persons who executed a Performer Agreement with Defendants in which they were classified as independent contractors and worked as a Performer for Defendants at any time from August 6, 2019, to the present, in the state of New Jersey. See, e.g., Cert. Mot. at 1. The proposed class is sufficiently defined with reference to objective criteria, since it is grounded on a factual determination and not premised on a legal conclusion. See, e.g., Bedoya v. Am. Eagle Express, Inc., No. 14-2811, 2022 WL 3443983, at *15 (D.N.J. Aug. 17, 2022). In addition, there is a reliable and administratively feasible mechanism for Defendants to determine potential class members; indeed, Plaintiff has informed the Court that Defendants have identified approximately 281 Performers who meet the defined class criteria. See Kocher Decl. ¶ 11. Accordingly, the Court is satisfied that the putative class is sufficiently ascertainable.

---

[6] Defendants do not "dispute that Plaintiff could meet the requirements of (1) numerosity of the putative class and (4) adequacy of counsel's representation under" Federal Rule of Civil Procedure 23(a). Opp'n Br. at 15 n.7. Therefore, the Court's analysis is limited to the requirements of Rule 23 that Defendants appear to challenge or otherwise fail to explicitly waive.

### B.    Rule 23(a) Requirements

#### 1.    Commonality

Rule 23(a)(2)'s commonality requirement is satisfied if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The Third Circuit has described this requirement as "straightforward," explaining that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." In re Schering Plough Corp. ERISA Litig., 589 F.3d 585, 597 (3d Cir. 2009). Because the language of Rule 23(a)(2) is "easy to misread, since [a]ny competently crafted class complaint literally raises common questions," the putative class must "generate common answers apt to drive the resolution of the litigation," as opposed to raising "common questions." Dukes, 564 U.S. at 349–50 (citation and internal quotation marks omitted).

But where a party seeks certification under Rule 23(b)(3), as here, "the commonality requirement 'is subsumed by the predominance requirement.'" Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008) (quoting Georgine v. Amchem Prods., Inc., 83 F.3d 610, 627 (3d Cir. 1996)). Therefore, the Court will address Rule 23(a)(2)'s commonality requirement with its analysis of Rule 23(b)(3)'s predominance requirement. See, e.g., In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 266 (3d Cir. 2009) ("analyz[ing] the two factors together, with particular focus on the predominance requirement." (citation and internal quotation marks omitted)).

#### 2.    Typicality

Rule 23(a)(3)'s typicality requirement mandates Plaintiff proves that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Unlike the Court's commonality analysis, which evaluates the sufficiency of the

class itself, the typicality analysis evaluates the sufficiency of Plaintiff.  See, e.g., Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994).

In order to satisfy typicality, "(1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class."  Schering Plough, 589 F.3d at 599.  The typicality "criterion acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'"  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001), as amended (Oct. 16, 2001) (quoting Georgine, 83 F.3d at 631).

Here, Plaintiff asserts that Rule 23(a)(3)'s typicality requirement is satisfied because Defendants treat Plaintiff and putative class members uniformly.  See Cert. Mot. at 16–17. Plaintiff points to the fact that Plaintiff and all putative class members are classified as independent contractors pursuant to the terms of nearly-identical Performer Agreements, all of which subject Plaintiffs and putative class members alike to the same rules, policies, and procedures.  See id. Similarly, Plaintiff highlights the consistent payment practices of Streamate—that Performers are not paid by Streamate while in their free chat areas, and that Streamate retains a portion of all Gold transactions paid to Performers.  Id. at 17.

Typicality here is satisfied.  Plaintiff's alleged injuries—unpaid wages, tips, and illegal deductions—are representative of the putative class's injuries.  These alleged injuries arise out of the same alleged misclassification of all Performers as independent contractors.  All members of the putative class advance the same legal theory that Defendants exercised sufficient control over

Performers' work, such that the Performers should have been classified as Defendants' employees.

In arguing against typicality, Defendants point to two of the six produced Performer Agreements that contain mandatory arbitration provisions. And because Plaintiff's signed version of the Performer Agreement does <u>not</u> contain a mandatory arbitration provision, Defendants argue that she "is not typical of those in the purported class who are subject to it." <u>Id.</u> at 21. But that is not enough to defeat typicality at the class certification stage.[7]

First, Defendants' potential arbitration defense would not apply to Plaintiff. <u>Cf. Beck v. Maximus, Inc.</u>, 457 F.3d 291, 296–97 (3d Cir. 2006) (cautioning against certification when class representative may be subject to unique defense). Second, the two Performer Agreements containing the arbitration provisions only govern Performers who signed agreements during a relatively short period of time in comparison to the full class period, which spans over five years. <u>See</u> Opp'n Br. at 20–21 ("[A]ny performer who accepted a version of the Performer Agreement during the 17-month period from April 1, 2020 through September 14, 2021, but did not accept the terms and conditions of any subsequent Performer Agreement after September 15, 2021 . . . [is] subject to [the arbitration provision]."). As such, while Defendants have not produced any executed Performer Agreements containing a mandatory arbitration provision, nor identified any putative class members who are subject to said provision,[8] the Court can reasonably infer at this stage that Plaintiff will be representative of the majority of putative class members. Given the foregoing, "there is no significant defense that is both inapplicable to many members of the class

---

[7] "Courts have held that issues related to arbitration agreements do not have to be resolved at the class certification stage; but can be resolved through the creation of subclasses or the elimination of some members of the class at a later stage." <u>Slamon v. Carrizo (Marcellus) LLC</u>, No. 16-2187, 2020 WL 2525961, at *22 (M.D. Pa. May 18, 2020) (collecting cases).

[8] <u>See</u> Reply Br. at 5 ("Defendants have not identified which Class Members are potentially subject to the arbitration provision and have not produced any signed arbitration agreements in discovery, as requested by Plaintiffs on November 30, 2023."); <u>see also id.</u> at 12 ("Defendants refused to produce the Rule 23 class list." (citing ECF No. 59 at 10)).

or likely to become a major focus of the litigation . . . ."  See Salvatora v. XTO Energy Inc., No. 19-01097, 2023 WL 4137306, at *16–17 (W.D. Pa. June 2, 2023), adopted sub nom., Salvatora v. XTO Energy Inc., No. 19-01097, 2023 WL 4135570 (W.D. Pa. June 22, 2023).[9]

Next, Defendants contend that Plaintiff's allegations regarding the "amount of control allegedly exerted by Streamate" is not typical of other putative class members.  Opp'n Br. at 16–17.  But the examples that Defendants point to do not depict Plaintiff's atypicality with respect to her perception of Defendants' control.  For example, Defendants assert that, unlike Plaintiff, at least two other putative class members have not been told to mention "special interests or kinks" in their profiles and have not been told to "add some pictures to your gallery to draw in a crowd."  Opp'n Br. at 17 (citing Cert. Mot. at 5).  But this is not accurate.  The two Performers referenced by Defendants in their effort to demonstrate atypical control presumably had access to the same source—Streamate's October 30, 2023, "Developing Your Style" guide, see ECF No. 49.7—that Plaintiff argues is an example of control exerted by Defendants.[10]

Lastly, despite Defendants' unavailing arguments to the contrary, see Opp'n Br. at 19–20,

---

[9] To the extent that Defendants intend to raise an arbitration defense post-certification, a motion may be made to amend the class definition to exclude such members to enable the Court to determine the class composition and analyze "the specific arbitration agreements that [Defendants] wish[] to enforce."  See In Re Ductile Iron Pipe Fittings ("DIPF") Direct Purchaser Antitrust Litig., No. 12-711, 2016 WL 5508843, at *2 (D.N.J. Sept. 28, 2016).  It is within the Court's authority to redefine a proposed class to maintain a class action.  See Fed. R. Civ. P. 23(c)(1).

[10] Defendants' other examples fail for similar reasons.  Defendants appear to argue that only Plaintiff felt as if Streamate "directed her" to purchase costumes and props.  See Opp'n Br. at 17.  But Defendants miss that mark. There, Plaintiff was recalling a stylistic guide similar to Streamate's October 30, 2023, "Developing Your Style" guide, see ECF No. 49.7.  See Tomasello Dep. Tr. at 221:6–222:19.  Moreover, Streamate's October 30, 2023, "Developing Your Style" guide clearly encourages its Performers to "expand [their] prop collections" and to "[k]eep around clothes that make you feel sexy, confident, and comfortable," like "[c]ostumes."  ECF No. 49.7.  Defendants also argue against typicality by asserting that Plaintiff's purchase of equipment is atypical to that of other Performers. See Opp'n Br. at 17.  But Defendants admit that they require their Performers to own a webcam, computer, and internet connection, see, e.g., Answer ¶¶ 26, 51, and that they do not reimburse Performers "for web-streaming equipment," see, e.g., id. ¶¶ 26–27.  Logically, if an individual wants to stream on or upload content to Streamate, but does not already own the requisite web-streaming equipment, they would need to purchase it without reimbursement.  At least two versions of the Performer Agreements explicitly require this.  See Kocher Decl., Ex. B at DEF_000016, DEF_000022 ("Performer . . . also warrants and represents to Streamate . . . [that they] have purchased the equipment necessary to conduct the performances.").

Plaintiff's interests are sufficiently aligned with that of the putative class.  Defendants put forth testimony of two Performers—out of nearly 300 hundred putative class members—who emphasize their desire to be well compensated, to set their own working hours, and to choose the location from which they may work.  Id.; see also A.T. Decl.; W.G. Decl.  But at bottom, Plaintiff seeks protections under New Jersey's wage-and-hour laws, as do members of the putative class.  There is no indication that Plaintiff's claims are in any way in conflict with other members of the putative class.  Therefore, the Court finds that Rule 23(a)(3)'s typicality requirement is satisfied.

### 3.    Rule 23(b)(3) Requirements

#### a.    Predominance

To satisfy the first requirement of Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).  And although courts may not decide cases on the merits at the class certification stage, a court must essentially "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues will predominate."  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir. 2008), as amended (Jan. 16, 2009) (quoting In re New Motor Vehicles Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)).

"In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, through the prism of Rule 23, undertake a rigorous assessment of the available evidence and the method or methods by which the plaintiffs propose to use the evidence to prove those elements."  Reinig v. RBS Citizens, N.A., 912 F.3d 115, 128 (3d Cir. 2018)

(quotation marks omitted). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 183 (3d Cir. 2001)).

Here, Plaintiff claims that Defendants misclassified them as independent contractors under the Performer Agreements that Plaintiff and all other Performers are required to sign. Due in part to this alleged misclassification, Plaintiff claims that Defendants violated the NJWHL by failing to pay Performers "for all hours worked," N.J.A.C. 12:56-5.1. See Am. Compl. ¶¶ 83–98. Plaintiff also claims that Defendants violated the NJWPL by withholding wages due to them as employees by (1) failing to compensate for hours worked, (2) withholding wages by mandating purchases without reimbursement, and (3) withholding wages by diverting gratuity paid to Performers. See Am. Compl. ¶¶ 99–115.

To sufficiently prove the NJWPL and NJWHL claims for purposes of class certification, Plaintiff must demonstrate that the putative class members were employees under the NJWHL entitled to "all wages, when due, for all hours of work at hourly rates equal to the minimum wage rate," Am. Compl. ¶ 88 (citing N.J.S.A. 34:11-56a4), and were protected from wage deductions under the NJWPL, Am. Compl. ¶¶ 106–07, 111–15 (citing N.J.S.A. 34:11-4.4). At this stage, "the predominance requirement is met only if the district court is convinced that the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members." Reinig, 912 F.3d at 127 (quotation marks omitted). Accordingly, the Court will analyze Plaintiff's claims in turn.

### i.    Misclassification – ABC Test

Plaintiff's claims under the NJWHL and NJWPL are dependent in part on demonstrating

that she and all putative class members are Defendants' employees—rather than independent contractors—under New Jersey law. New Jersey courts utilize the so-called "ABC" test in determining whether an individual is an employee or an independent contractor for NJWHL and NJWPL claims. See Hargrove v. Sleepy's, LLC, 106 A.3d 449, 465 (N.J. 2015). Under the ABC test, an individual is presumed to be an employee, as opposed to an independent contractor, unless the employer can show:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

See, e.g., id. at 458 (citing N.J.S.A. 43:21–19(i)(6)(A)–(C)).

As to the first prong, an employer "must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance." Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 593 A.2d 1177, 1185 (N.J. 1991). An "employer need not control every facet of a person's responsibilities . . . for that person to be deemed an employee." Id.; see also Hargrove, 106 A.3d at 459 (same). This is a fact-sensitive inquiry that requires the Court to evaluate all circumstances surrounding the employment relationship, including the actual performance of work. See Hargrove, 106 A.3d at 464.

Here, Defendants cannot make that showing. First, common evidence can answer whether Performers were contractually free from Defendants' control. All Performers are required to execute a Performer Agreement, which governs the Performers' relationship with Defendants and are largely uniform across the six versions provided to the Court. See generally Kocher Decl., Ex. B; see also Answer ¶ 17 ("ICF requires performers to execute a written performer agreement."). Although the Court makes no merits determination at this stage, facts pertinent to proving issues of contractual control are provable by common evidence. See, e.g., Bedoya, 2022 WL 3443983, at *9 ("[C]ourts have found prong A provable by common evidence, and have also certified similar classes, after citing similar uniform agreements and company-wide policies." (collecting cases)).

Second, common evidence will inform whether Performers were factually free from Defendants' control. And while this second inquiry "may in certain cases require an individualized inquiry," Defendants fail to demonstrate how individual questions—like potentially varied defenses for individual class members—would preclude resolution by common evidence.

The Performer Agreements mandate that Performers comply with certain conditions, see, e.g., Kocher Decl., Ex. B at DEF_000005, violations of which will result in a Performer's termination. For example, Streamate has the capabilities to block or remove uploaded content, and block or remove livestreamed content, if it is deemed illegal or in violation of the governing Performer Agreement. See, e.g., id. at DEF_000003–4. Indeed, the three Performers before the Court each testified to or declared their recollection of being suspended from Streamate. See, e.g., Tomasello Dep. Tr. at 41:9–20; A.T. Decl. ¶ 6; W.G. Decl. ¶ 6.

And these requirements go beyond legal compliance. For example, a Performer may be in violation of their Performer Agreement if activity is deemed "inappropriate," which is not further defined. See, e.g., Kocher Decl., Ex. B at DEF_000005. Defendants, through Performer

Agreements and other resources provided to Performers, control what Performers may or may not display on their livestream performances. Defendants prohibit Performers from displaying "below the waste nudity" in free chat areas; appearances of animals; depictions of alcohol or drugs; promotions for "non-Streamate related website[s]," among other restrictions. See, e.g., id. at DEF_000005. And while Performers are free to choose their viewing rates, when they work, the duration of their work, where they work from, and largely how they work, "it is not necessary that the employer control every aspect of the worker's trade; rather some level of control may be sufficient." Hargrove, 106 A.3d at 459.

In opposition, Defendants claim that certain individualized questions prevent class certification, including by way of providing potential defenses. First, Defendants argue that questions regarding application of New Jersey wage-and-hour laws to Performers is too individualistic and point to the difficulty in determining "which [P]erformer(s) 'worked' by performing on Streamate within the State of New Jersey." See Opp'n Br. at 24. But that does not defeat predominance. Putting aside questions concerning the extraterritorial application of the NJWPL and NJWHL,[11] the locations of Performers can be determined through several methods, including the tracking of internet protocol (IP) addresses,[12] or soliciting testimony of class members. To the extent Defendants' argument on this point goes towards the potential difficulty in calculating damages, it is not enough to preclude class certification. See, e.g., Neale v. Volvo

---

[11] Defendants do not appear to argue—and indeed, fail to cite to supporting law—that the NJWPL and NJWHL are inapplicable to New Jersey residents who perform some work out-of-state. See Opp'n Br. at 23–25. And while courts in this District have previously found New Jersey wage-and-hour laws inapplicable "for any alleged misclassification of work [] performed entirely outside of New Jersey," see Ortiz v. Goya Foods, Inc., 19-19003, 2020 WL 1650577, at *2 (D.N.J. Apr. 3, 2020), the Court need not reach this meritorious question at this stage.

[12] Notably, the Performer Agreements permit Streamate "to block Performer/Studio's access to any Streamate website, including but not limited to from a particular internet address to any Streamate website." See, e.g., Kocher, Ex. B at DEF_000019 (emphasis added); id. at DEF_000034 ("[Streamate] reserve[s] the right to block Performer's access to our website, including but not limited to from one or more specific internet addresses." (emphasis added)). By admitting to being capable of blocking specific IP addresses, Defendants admit to possessing Performers' IP addresses.

Cars of N. Am., LLC, 794 F.3d 353, 374–75 (3d Cir. 2015) (recognizing "that individual damages calculations do not preclude class certification under Rule 23(b)(3)"); Lawrence v. NYC Med. Practice, P.C., No. 18-8649, 2024 WL 307842, at *8 (S.D.N.Y. Jan. 26, 2024) ("While the question of how many hours each individual class member worked, including from home, is relevant to proving class members' individual damages, it is 'well-established' that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification.'" (emphasis added) (quoting Roach v. T.L. Cannon Corp., 778 F.3d 401, 405 (2d Cir. 2015))).

Second, Defendants argue that individual questions of control cannot be resolved by common evidence. Specifically, Defendants assert Plaintiffs' reliance on the Streaming Rules FAQ, see Kocher Decl., Ex. F, and provided "guides," see ECF No. 49.7, fail to establish control because these resources are "voluntary help guides" that are "not an independent source of control." Opp'n Br. at 26–28. Further, the capability to monitor, block, and remove Performers, their content, and/or their livestreams are insufficient to establish Defendants' control over its Performers. Id. at 28–32. But these arguments go to an analysis of the merits, which the Court will not do here. See Amgen, 568 U.S. at 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); Williams v. Jani-King of Phila. Inc., 837 F.3d 314, 322 (3d Cir. 2012) ("[T]he class certification stage is not the place for a decision on the merits.").

Third, Defendants argue that individual inquiries into the compensation that each Performer received are required here. This may be true, but it can nonetheless be proven by common evidence. To determine wage and hour violations, the amount each Performer is paid

must be examined on a consistently timed basis and compared to the number of hours they work. Damages can be determined by dividing total compensation by total hours worked and determining whether that amount is greater or less than the amount a Performer would make earning minimum wage for the same number of hours. Defendants maintain payroll records that reflect the amount of Gold received by Performers, see, e.g., Opp'n Br. at 35–36; Rekevics Decl. ¶ 5, and "total paid minutes online" of Performers, Answer ¶ 16. Therefore, individual questions of liability and damages are provable class-wide by common evidence. And the precise apportionment of damages among class members is not a barrier to class certification. See, e.g., Neale, 794 F.3d at 375 (noting that "individual damages calculations do not preclude class certification").

Under the NJWPL, Plaintiff has proposed a calculus that would determine missing compensation for all hours worked.[13] See Cert. Mot. at 25. Specifically, Plaintiff contends that the amount of time spent in free chat—which would be compensable under the NJWPL, if Performers are employees—"is knowable by adding the amount of time in 'Gold shows' and 'total paid hours' and subtracting the amount of time from the 'total streamed hours.'" Id. This calculus is provable by common evidence. Defendants can calculate a Performer's "total minutes online" and their "total paid minutes online." Answer ¶ 16. Defendants can also calculate the total amount of time that a Performer streams in both free chat and paid chat. Id. ¶ 37. This calculus is applicable class-wide. And "obstacles to calculating damages may not preclude class certification" provided that the class can show "the fact of damage . . . on a common basis." Harnish v. Widener Univ. Sch. of Law, 833 F.3d 298, 306 (3d Cir. 2016) (quotation marks omitted). As such, Plaintiff

---

[13] Defendants appear to confuse Plaintiff's proposed calculus for determining compensation owed for all hours worked as their effort for determining whether or not Performers were paid minimum wage. Compare Cert. Mot. at 24–25, with Opp'n Br. at 33–35. While there is overlap, these are two distinct analyses.

has met her burden for purposes of the predominance inquiry.[14]

Like the first prong, the second prong of the ABC test are also provable by common evidence. Defendants must prove that services provided by Performers were "either outside the usual course of the business . . . or that such service is performed outside of all the places of business of the enterprise." N.J.S.A. 43:21–19(i)(6)(B). This analysis can be resolved by common evidence "because the questions it raises—about the nature of the service provided, the usual course of business of the employer, and whether the service was performed at the employer's place of business are fairly abstract, and do not vary by individual." Carrow v. FedEx Ground Package Sys., Inc., No. 16-3026, 2019 WL 7184548, at *10 (D.N.J. Dec. 26, 2019).

Defendants concede that they operate "a website that serves as a host for livestreaming and other content for adult-oriented independent, freelance performers." Opp'n Br. at 2. Plaintiff is one of many such Performers belonging to the putative class, all who "stream[] live performances for Streamate" and/or upload content. See, e.g., Am. Compl. ¶ 10; Opp'n Br. at 2–3. Additionally, Streamate's business model permits each Performer "to access and perform on the Streamate website from virtually any location with Internet access." Opp'n Br. at 8. This second prong is provable by common evidence.

As to the third prong, Defendants must prove that the Performers were "customarily engaged in an independently established trade, occupation, profession or business." N.J.S.A. 43:21-19(i)(6)(C). In other words, courts must determine whether the individual providing the

---

[14] As aptly explained in Carrow v. FedEx Ground Package Systems, Inc.: "If Defendant[s are] found liable and complex damages issues present themselves, the Court has a number of tools it may avail itself of, including: 'appointing a magistrate judge or special master to preside over individual damages proceedings; decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; creating subclasses; or, altering and amending the class.'" No. 16-3026, 2019 WL 7184548, at *12 (D.N.J. Dec. 26, 2019) (quoting Martins v. 3PD Inc., No. 11-11313, 2014 WL 1271761, at *12 (D. Mass. Mar. 27, 2014)). Here, Defendants' objections to class certification because questions of individualized damages exist do not preclude satisfaction of the predominance inquiry.

service "has a profession that will plainly persist despite the termination of the challenged relationship." Carrow, 2019 WL 7184548, at *10 (quoting Hargrove, 106 A.3d at 459). "[I]f the person providing services is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed, the C standard is not satisfied." Bedoya, 2022 WL 3443983, at *10 (quoting Carpet Remnant Warehouse, 593 A.2d at 1187).

Here, Defendants have not put forth evidence demonstrating Performers' independence under this third prong. In order to upload content and livestream, Performers require an online content host. This further requires technological capabilities that are largely unavailable to Performers once their working relationship is terminated. By all accounts, Performers depend on Streamate for its hosting services and cannot maintain employment without said hosting services. The Court therefore finds that this third prong is provable by common evidence.

### ii.        NJWPL – Unlawful Deductions

In addition to Defendants' allegedly unlawful misclassification of Plaintiff and putative class members under the NJWPL and NHWHL, Plaintiff contends that Defendants violated the NJWPL by withholding wages due to them as employees. See, e.g., Cert. Mot. at 7, 15, 22–23. Pursuant to N.J.S.A. 34:11-4.4, an employer cannot "withhold or divert any portion of an employee's wages," unless (a) authorized under New Jersey and federal law or (b) for one of 11 enumerated purposes. N.J.S.A. 34:11-4.4(a)–(b).

"In determining whether Defendants violated the NJWPL, a trier of fact will decide (1) whether Defendants withheld wages from Plaintiff; (2) the purpose for withholding such wages; and (3) whether the purpose for withholding wages is one of the itemized reasons set forth in the NJWPL." Snyder v. Dietz & Watson, Inc., 837 F. Supp. 2d 428, 445 (D.N.J. 2011). The parties do not meaningfully address this claim. Nonetheless, the Court is satisfied that proof of these

elements may be substantiated by common evidence on a class-wide basis.

Plaintiff contends that Performers are owed reimbursement for purchases required by Streamate and are entitled to full value of Gold received as gratuity. The Performer Agreements make clear that Performers must "purchase[] the equipment necessary to conduct the performances." See, e.g., Kocher Decl., Ex. B at DEF_000016. The three Performers made known to the Court—Plaintiff, A.T., and W.G.—each testified or declared that they personally purchased the equipment they use for livestreaming or content creation with Streamate. See Tomasello Dep. Tr. at 135:13–22; A.T. Decl. ¶ 12; W.G. Decl. ¶ 10. Without making a merits determination, the Court finds this claim capable of being proven class-wide, because it may be proven through common evidence regarding Defendants' alleged failure to reimburse for work-related expenses and the justifications for said alleged failure. See Carrow, 2019 WL 7184548, at *11 ("[Plaintiffs] contend that Defendant indirectly took deductions from all class members by improperly placing the burden for certain expenses on them. If this legal theory holds up, then all class members have indeed suffered damages on a common basis."); see also Hall v. Nat'l Metering Servs., Inc., No. 20-1921, 2020 WL 5877679, at *1–2 (D.N.J. Oct. 1, 2020) (concluding at the motion to dismiss stage that allegations involving "fail[ure] to reimburse for work-related expenses," if true, entitled Plaintiff to relief under the NJWPL).

As to Plaintiff's allegations that Defendants unlawfully withheld "tips" paid to Performers via Gold, the Court similarly finds this claim to be proven by common evidence. While Gold may be used as a form of payment in several ways, Gold "can be – but it is not always – a form of compensation . . . generically referred to as a 'tip.'" Opp'n Br. at 35. Defendants admit that Streamate "receives a percentage of the revenue derived from customers' purchases on Streamate, including 'Gold.'" Answer ¶ 31; Opp'n Br. at 35 ("When a customer decides to spend Gold

27

directly on performances or content, Streamate and the performer share the revenue at an agreed-upon percentage pursuant to the applicable Performer Agreement.").  And while that percentage appears negotiable, see, e.g., Kocher Decl., Ex. B at DEF_000004, currently, "Streamate directly pays the [P]erformer the mutually agreed upon 35% revenue of the Gold transaction," Opp'n Br. at 10.

Defendants challenge to this claim is the potential difficulty in calculating damages, see Opp'n Br. at 35–36, not that they do not retain Gold paid to Performers as gratuity, or that they do not maintain accounting records of Gold payments.  But, again, "obstacles to calculating damages may not preclude class certification" if the putative class can demonstrate "the fact of damage" "on a common basis."  Harnish, 833 F.3d at 306 (quotation marks omitted).

b.    Superiority

A party seeking class certification under Rule 23(b)(3) must show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 316 (3d Cir. 1998) (internal quotation marks and citation omitted).  Rule 23(b)(3) provides a non-exhaustive list of factors relevant to the superiority requirement, including: the class members' interest in individually controlling the prosecution of separate actions; the extent and nature of any similar litigation already commenced by class members; the desirability of concentrating the litigation in a particular forum; and the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3)(A)–(D).

Defendants argue only that "the putative class definition is unmanageable" because a class-

wide resolution would require "individualized and fact-intensive" inquiries into Defendants' control over class members and into Defendants' failure to compensate Performers above the minimum wage requirement.  Opp'n Br. at 36–37.  The Court disagrees.

First, Defendants have informed Plaintiff that the putative class size is made up of approximately 281 members, see Kocher Decl. ¶ 11, which is a number that "is not so large as to present administrative difficulties," Charlot v. Ecolab, Inc., No. 18-10528, 2019 WL 6888621, at *16 (D.N.J. Dec. 17, 2019).   Individual inquiries into Defendants' exertion of control over Performers are also not unmanageable since, as partially discussed above, this can be proven by common evidence in contract, i.e., Performer Agreements, and in fact, i.e., through affidavits, testimony, records detailing warnings, suspensions, and terminations, and similar.   Indeed, the three Performers made known to the Court each testified to or declared their recollection of being suspended.  See, e.g., Tomasello Dep. Tr. at 41:9–20; A.T. Decl. ¶ 6; W.G. Decl. ¶ 6.  Second, liability under the applicable New Jersey wage-and-hour laws at issue here is capable of being determined on a class-wide basis, and "[a]ny issue determining damages does not defeat the superiority of a class action as to [Defendants'] liability."  Hargrove, 2022 WL 617176, at *12 (D.N.J. Mar. 2, 2022).

The remaining factors listed in Rule 23(b)(3) are also met here: Putative class members likely have no significant interest in individually controlling separate prosecutions because damages owed to each Performer may be relatively small, see Cert. Mot. at 26; the Court is not aware of any similar litigation commenced by putative class members concerning this controversy; and conducting the litigation in New Jersey is preferred given that the class is defined by reference to those Performers who worked or currently work in New Jersey.  Additionally, members of the putative class, including Plaintiff, may still be receiving compensation from Streamate through

continued uploading of content or livestreaming.  "[T]he fact that members of the putative class who currently work as entertainers for the [D]efendants may be reluctant to pursue any claims against the source of their income" "militate[s] in favor" of proceeding as a class.  Hart v. Rick's Cabaret Int'l Inc., No. 09-3043, 2010 WL 5297221, at *7 (S.D.N.Y. Dec. 20, 2010).  Lastly, Defendants have highlighted additional concerns of putative class members and issues of anonymity.  While not explicitly argued, the sensitive nature of Performers' work and identities likely favors resolution by class action, since a class member is one of many as opposed to one of one.  Accordingly, the Court finds that Plaintiffs have satisfied the superiority requirement.

## V.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification, ECF No. 51, is **GRANTED**.  An appropriate Order follows.


Date: April 23, 2025                              *s/ Madeline Cox Arleo*
                                                   **Hon. Madeline Cox Arleo**
                                                   **UNITED STATES DISTRICT JUDGE**