**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MIA TOMASELLO, on behalf of herself and all others similarly situated,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>ICF TECHNOLOGY, INC., and ACCRETIVE TECHNOLOGY GROUP, INC.,<br><br>    *Defendants.* | Civil Action No. 23-3759<br><br>OPINION |

ARLEO, UNITED STATES DISTRICT JUDGE

**THIS MATTER** comes before the Court by way of competing cross-motions for summary judgment filed by Plaintiff Mia Tomasello ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Plaintiffs" or "Performers"), and Defendants ICF Technology, Inc. ("ICF") and Accretive Technology Group, Inc. ("ATGI") (collectively, "Defendants").  See ECF Nos. 110, 113.

For the reasons set forth below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**, and Plaintiffs' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

I.    **UNDISPUTED MATERIAL FACTS**[1]

Plaintiffs are adult entertainers who livestream performances on Streamate.com ("Streamate"), a hosting platform created, operated, and maintained by Defendants. Plaintiffs bring this hybrid lawsuit asserting a collective action under the Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) ("FLSA") (Count I), and class claims under Federal Rule of Civil Procedure 23 for alleged violations of the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, et seq. ("NJWHL") (Count II), and the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1, et seq. ("NJWPL") (Count III & Count IV).

The core dispute here is the nature of the parties' relationship—specifically, whether Plaintiffs are independent contractors or employees within the meaning of the FLSA and New Jersey law. This classification is dispositive as to liability; if Plaintiffs are independent contractors, they lack statutory protection. If, however, an employment relationship exists, Defendants face potential liability for federal and/or state wage violations by withholding minimum wages, misappropriating tips, or failing to compensate Plaintiffs for all hours worked.

A.    **How Streamate Works**

Streamate is a live adult streaming platform managed by ICF, a Washington state corporation that operates social media platforms for adult content. See PSMF ¶ 2; DRPSMF ¶ 2; FAC ¶¶ 2–3; ECF No. 30 ("Ans.") ¶¶ 2–3. ATGI, also a Washington-based corporation, is the

---

[1] The Court draws the following facts from Defendants' Statement of Undisputed Material Facts ("DSMF"), see ECF No. 113.2; Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("PRDSMF), see ECF No. 119.1; Plaintiffs' Statement of Undisputed Material Facts ("PSMF"), see ECF No. 110.2; and Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts ("DRPSMF), see ECF No. 121.1. Where facts in a party's statement are supported by evidence in the record and denied by an opposing party without citation or conflicting evidence, the Court has deemed those facts undisputed. See Fed. R. Civ. P. 56(e)(2)-(3); L. Civ. R. 56.1(a); see Carita v. Mon Cheri Bridals, LLC, No. 10-2517, 2012 WL 2401985, at *3 (D.N.J. June 25, 2012). Uncontested facts based on hearsay have been considered where the Court has determined that the statements "are capable of being admissible at trial." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993).

corporate parent of ICF. See PSMF ¶¶ 1, 5; DRPSMF ¶¶ 1, 5; FAC ¶ 3; Ans. ¶ 3. A Performer[2] who streams live performances on Streamate is paid by ICF. See PSMF ¶¶ 4, 38; DRPSMF ¶¶ 4, 38. Streamate's business model permits Performers to access and perform on Streamate from virtually any location with internet access. See PSMF ¶ 3; DRPSMF ¶ 3.

Any adult can sign up to perform on Streamate.[3] See DSMF ¶ 22; PRDSMF ¶ 22. Before performing, Performers must register with the website, certify their eligibility, and execute a Performer Agreement. See PSMF ¶¶ 6, 8; DRPSMF ¶¶ 6, 8; Ans. ¶ 17; see also DSMF ¶ 57 (noting Plaintiffs must select and purchase their own equipment and accessories). Defendants subsequently verify that performers meet minimum age requirements, have signed the Performer Agreement, and that their livestreaming and content uploading activities are legal in their home state. See ECF No. 110.5, Ex. B, at 1839–40. Defendants also approve a Performer's Streamate biography and profile picture. See PSMF ¶ 17; DRPSMF ¶ 17. Once these hurdles are cleared, a Performer may access, upload, and/or stream on Streamate, and determine how to interact with customers. See DSMF ¶ 54; PRDSMF ¶ 54.

Potential customers can visit Streamate's home page—which depicts photograph thumbnails of then-online Performers—without paying for immediate access. See DSMF ¶¶ 28–29; PRDSMF ¶¶ 28–29. They may also utilize Streamate's search functions to explore Performers by keywords or categories. See id.; see also FAC ¶ 11 n.7 (citing https://streamate.com/support/faq). From there, a potential customer may begin viewing a Performer's livestream and/or uploaded content. See DSMF ¶¶ 28–34.

---

[2] Defendants' standard Performer Agreement defines adult content creators as "Performers." See ECF No. 110.5, Ex. B, at 1839–40.

[3] According to one of Defendants' 30(b)(6) corporate representatives, Performers do not need to have a specialized skill to become Performers. See ECF No. 113.7, Deposition Transcript of Elizabete Rekevics ("Rekevics Dep. Tr."), at 153:14–18; see also FAC ¶ 51 ("Performers do not have a specialized skill"); Ans. ¶ 51.

Performers may generally engage with potential customers in one of two ways: "free chat" or "paid chat." PSMF ¶ 9; DRPSMF ¶ 9. In the free chat space, a customer can watch a Performer's livestream, message the Performer in the chat room, and purchase the Performer's pre-recorded content.[4] See id. A potential customer who accesses a specific Performer's free chat area is not required to pay for viewing a Performer's livestream or interacting in the Performer's chatroom. See PSMF ¶ 10; DRPSMF ¶ 10. Performers' free chat streams are listed on Streamate's homepage in clickable thumbnails according to an algorithm based on several factors, including streaming quality, streaming consistency, customer ratings, and recent earnings. See DSMF ¶ 29; PRDSMF ¶ 29.

A potential customer who is viewing a Performer's free chat area may give that Performer "Gold," which is Streamate's "virtual currency." See DSMF ¶¶ 23–24; PRDSMF ¶¶ 23–24. Customers exchange real money for Gold at an exchange rate of 1:1. See DSMF ¶ 23. A Performer who is given Gold would receive approximately 35% revenue share of the Gold transaction, while Streamate would receive approximately 65% from the same transaction. See PSMF ¶ 16; see also DRPSMF ¶ 16 ("Defendants share additional revenue based on advertising or referrals"). While Performers appear to have the right to negotiate their percentage split of revenues for live performances with Streamate, neither party has provided evidence that any Performer actually received more than 35% from a Gold transaction. See DSMF ¶ 25; PRDSMF ¶ 25. It is undisputed that Defendants do not pay Performers for time spent in free chat. See PSMF ¶ 11; DRPSMF ¶ 11. Thus, if Gold is not earned in the free chat, Performers receive no compensation for their time spent there. See PSMF ¶ 12; DRPSMF ¶ 12.

---

[4] Additional free chat functions include (1) the Gold Menu, which lists specific actions for a price; (2) Spin-the-Wheel, which allows customers to pay a price to spin a digital wheel containing actions that the performer will carry out depending on where the wheel lands; and (3) the interactive toy feature, whereby a customer pays a certain amount of Gold to activate a sex toy. See DSMF ¶ 31; PRDSMF ¶ 31.

A customer who wants a more explicit or private experience can pay to enter a "paid chat" with a Performer.  See DSMF ¶ 35; PRPDMF ¶ 35.  For a paid chat, customers pay a flat rate or per minute for private (small group), exclusive (one-on-one), or Gold shows (where the Performer begins the show once a group of customers collectively pays a flat fee set by the Performer).[5]  See DSMF ¶¶ 62–64; PRDSMF ¶¶ 62–64.  Once a Performer accepts a paid chat, their profile is no longer viewable in the free chat area.  See ECF No. 57.8, Decl. of Elizabete Rekevics at ¶ 5. Access to the paid chat area is permitted only after an initial, probationary period in the free chat space.  See PSMF ¶ 9; DRPSMF ¶ 9.

To drive consumer traffic to Streamate, Defendants made substantial corporate investments in both personnel and large-scale advertising and marketing infrastructure.  See PSMF ¶¶ 39, 42 (advertising), 41, 43 (personnel); DRPSMF ¶¶ 39, 41, 42, 43.

**B.    Performer Agreements and Streaming Rules**

Performers are bound by the terms of their Performer Agreements, which Streamate may terminate at its "sole discretion."  PSMF ¶ 31; DRPSMF ¶ 31.  The Performer Agreements require Performers to comply with certain conditions.  See DSMF ¶ 46; PRDSMF ¶ 46.  For example, Defendants prohibit Performers from displaying "below the waist" nudity in the free chat space.  See PSMF ¶ 19; DRPSMF ¶ 19.  Defendants also prevent Performers from engaging in "fraudulent activity," i.e., "any activity that violates any law, that results in complaints or chargebacks, or that is deemed inappropriate by [Defendants]."  PSMF ¶ 20; DRPSMF ¶ 20.  The Performer Agreement—which labels Performers independent contractors, not employees, see

---

[5] Streamate distinguishes between a Performer's "total minutes online" (free chats plus paid chats) and "total paid minutes online" (paid chats only, comprised of private, exclusive, and Gold show minutes) and compensates Performers only for the latter.  See FAC ¶¶ 33, 35, 45; Ans. ¶¶ 33, 35, 45.  Streamate concedes to tracking Performers' "total minutes online" and their "total paid minutes online."  FAC ¶¶ 16, 45; Ans. ¶¶ 16, 45.  It is not clear from the record how or how much Streamate compensates Performers for time spent in paid chat; only that Performers and Streamate share all revenue derived from Gold transactions in both free and paid chats, with Streamate receiving 65% of the Gold a Performer earns and the Performer receiving 35%.

DSMF ¶ 3; PRDSMF ¶ 3—does not further define what may constitute "inappropriate." Defendants also ban Performers from, among other things, consuming alcohol on-camera during streams.   See PSMF ¶ 28; DSMF ¶ 3; DRPSMF ¶ 28.

Streamate also provides Performers a "Streaming Rules FAQ," which details specific guidelines, disciplinary protocols, and enforcement procedures.   See PSMF ¶ 30; DRPSMF ¶ 30; see also ECF No. 49, Ex. F (clarifying how Streamate enforces rules and handles policy violations). Disciplinary measures range from a warning, account suspension, or the closure of a Performer's livestream or Streamate account.   See PSMF ¶ 29; DRPSMF ¶ 29.   Defendants closely monitor Performers for compliance with their rules.   PSMF ¶¶ 24, 34; DRPSMF ¶¶ 24, 34.

Performers use their Streamate usernames across similar platforms and social media and widely advertise their Streamate activity to fans, subscribers, and potential customers.   See DSMF ¶ 56; PRDSMF ¶ 56.   Streamate does not restrict Performers from performing or providing content for competitor websites.   See DSMF ¶¶ 68, 72; PRDSMF ¶¶ 68, 72.   Defendants, however, forbid Performers from wearing specific clothing while streaming on Streamate that would reflect their personal social media accounts or similar adult platforms.   See PSMF ¶ 27; DRPSMF ¶¶ 27; 28.

Performers are free to set their own schedule and business hours and can decide the times and length of their performances.   See DSMF ¶ 52; PRDSMF ¶ 52; see also ECF No. 113.8, at 3303 ("The parties agree we will not specify the hours or times when you will provide performances, and you are free to choose your own such hours and times"); ECF No. 49.6, Ex. D, Dep. Tr. of Mia Tomasello ("Tomasello Dep. Tr."), at 235:10–13 (stating similarly).   Performers can also set their own prices to better control their earnings and filter consumers.   See DSMF ¶¶ 37, 65; PRDSMF ¶¶ 37, 65.   Moreover, Defendants do not provide mandatory training to

performers or require performers to utilize any particular part of the website. See DSMF ¶ 27; PRDSMF ¶ 27. Performers thus retain autonomy over their venue, content, pricing, and workspace styling. See PSMF ¶ 3; DRPSMF ¶ 3; DSMF ¶¶ 52, 55–56, 57, 61, 65, 67; PRDSMF ¶¶ 52, 55–56, 57, 61, 65, 67.

### C.    Plaintiff's Experience

Plaintiff is a resident of New Jersey and worked as a Performer for Defendants.[6] See DSMF ¶ 20; PRDSMF ¶ 20. Following her registration with Streamate and execution of the Performer Agreement, Plaintiff began livestreaming adult content. See FAC ¶ 10; Ans. ¶ 10. Plaintiff first started streaming for Streamate while she was living in Florida. See Tomasello Dep. Tr. at 139:4–11. In December 2023, Plaintiff relocated to New Jersey. Id. at 139:7–11.

To access Streamate, Plaintiff purchased certain equipment, including a computer, webcam, and internet connection. See PSMF ¶ 40; DRPSMF ¶ 40; see also Ans. ¶ 26 (admitting that all Performers must purchase or own for use "technology needed to process data (computer), stream video (a webcam), and the internet (an internet connection)"). Defendants did not reimburse Plaintiff (or other Performers) for these expenses. FAC ¶ 27; Ans. ¶ 27. In preparing to stream on Streamate, Plaintiff also purchased other "work-related things," such as costumes. See Tomasello Dep. Tr. at 135:13–19.

According to Plaintiff, "there [are] a lot of rules that [a Performer has to] follow with Streamate." Tomasello Dep. Tr. at 71:21–22. Plaintiff recalls Streamate suspending her "for about a week because [she] wasn't performing tasks up to par according to . . . their standards." Id. at 41:5–20. Plaintiff also testified that Streamate suspended her for not "performing to [Streamate's] liking" during paid chats. Id. at 127:7–8. And Plaintiff received "disciplinary

---

[6] While there is conflicting testimony as to when Plaintiff first began performing on Streamate, it is undisputed that Plaintiff did, in fact, perform on Streamate. Compare FAC ¶ 1, with Ans. ¶ 1, and Tomasello Dep. Tr. at 139:4–16.

warning[s]" from Streamate for "promot[ing] herself" on other social media platforms, among other things.   Id. at 46:6–11, 128:22–24; see also PSMF ¶¶ 32–33; DRPSMF ¶¶ 32–33.

Plaintiff's content remains uploaded and available for viewing on Streamate, see Tomasello Dep. Tr. at 68:16–19, but Plaintiff has since ceased livestreaming on Streamate because she feels as though Streamate is "too demanding and [doesn't] pay enough," see id. at 124:9–10.

## II.    PROCEDURAL BACKGROUND

In July 2023, Plaintiff, on behalf of herself and all others similarly situated, filed a class and collective action complaint against Defendants.   See ECF No. 1.   She amended her complaint six months later, see ECF No. 29 ("FAC"), alleging Defendants have violated and continue to violate the FLSA, NJWHL, and NJWPL by misclassifying Performers as independent contractors rather than employees, retaining 65% of the online tips they earn, and paying them less than a minimum hourly wage under federal and New Jersey law.   See FAC ¶¶ 5–6; 77–81; 87–97.

For the FLSA claim (Count I), the Court conditionally certified a collective of opt-in Performers who worked for Defendants in New Jersey during the three years preceding this case through the entry of judgment.   See ECF No. 48, at 2–3 (citing FAC ¶ 56).   For the state law claims (Counts II–IV), the Court certified a class of New Jersey Performers categorized as independent contractors from August 6, 2019 through the entry of judgment.   See ECF No. 92, at 1–2.   In April 2025, the Court granted final certification for both the collective and class action groups.   See ECF No. 91.

The notice and discovery periods have ended.   See ECF No. 89; DSMF ¶¶ 14–18.   As of April 21, 2026, the collective and class membership consists of approximately 385 Performers. See ECF No. 137; see also DSMF ¶¶ 8–9.

### III.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), the Court will grant a motion for summary judgment if the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   See Scanlan v. Am. Airlines Grp., 102 F.4th 164, 170 (3d Cir. 2024).   A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."   Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   "A fact is material if 'it might affect the outcome of the suit under the governing law.'"   Id. (citation omitted).

At the summary judgment stage, the Court's role is not to weigh the evidence or determine the ultimate truth of the allegations.   See Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (citation omitted).   While the Court construes all facts and inferences in the light most favorable to the non-moving party, Cephalon, Inc., 954 F.3d at 618, "[the moving party] . . . must point to concrete evidence in the record that supports each and every essential element of his [or her] case," Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023).   The evidentiary burden is "rigorous," and "mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment."   Roofer's Pension Fund v. Papa, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (citing Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995)).

"The standard does not change when the issue is presented in the context of cross-motions for summary judgment."   Appelmans v. Philadelpia, 826 F.2d 214, 216 (3d Cir. 1987).   "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in

accordance with the Rule 56 standard." Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 402 (3d Cir. 2016) (citation omitted).

## IV.    DISCUSSION

The threshold issue that must be decided is the same for all of Plaintiffs' claims: have Defendants improperly classified Plaintiffs as independent contractors? This determination is dispositive of all claims because if Plaintiffs are independent contractors, they lack statutory protection. If, however, Plaintiffs are employees, Defendants may be subject to liability for federal and/or state wage violations. The final determination of worker status remains a strict legal conclusion within the sole province of this Court. See Razak v. Uber Techs., Inc., 951 F.3d 137, 144 (3d Cir. 2020) (holding that "the ultimate question of law is whether Plaintiffs are employees or independent contractors, which is for a judge to decide"); see also Verma v. 3001 Castor, Inc., 937 F.3d 221, 229 (3d Cir. 2019) ("[a] district court may resolve the [classification] issue before trial based on undisputed facts in the record").

To resolve this central issue, the Court must apply two distinct legal frameworks. First, the Court evaluates Plaintiffs' federal status under Count I by applying the federal "Economic Reality" test to the FLSA claim. Second, the Court analyzes the remaining state law claims under Counts II through IV by applying the New Jersey "ABC" test.

### A.    FLSA Claim (Count I)

Under the FLSA, an employee is entitled to a minimum wage per hour worked. This benefit applies only to employees; independent contractors are exempted from FLSA's coverage. See 29 U.S.C. § 206. The FLSA generally defines an employee as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). An

independent contractor, by contrast, is "one who renders services but retains control over the manner in which those services are performed, agreeing only to accomplish results.'" Walfish v. Nw. Mut. Life Ins. Co., No. 16-4981, 2019 WL 1987013, at *6 (D.N.J. May 6, 2019) (quoting Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 593 A.2d 1177, 1185 (N.J. 1991)).

While "[t]here is no single test to determine whether a person is an employee or an independent contractor for purposes of the FLSA," the Supreme Court has emphasized that "courts should look to the economic realities of the relationship in determining employee status under the FLSA." Martin v. Selker Bros., Inc., 949 F.2d 1286, 1293 (3d Cir. 1991) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)). The determination of the employment relationship does not depend on isolated factors but rather upon the "circumstances of the whole activity." Martin, 949 F.2d at 1293 (citation omitted).

To guide this holistic inquiry, the Third Circuit utilizes a six-factor "economic reality" test to ascertain a worker's status under the FLSA. See Li v. Renewable Energy Sol.'s, Inc., No. 11-3589, 2012 WL 589567, at *6 (D.N.J. Feb. 22, 2012). The six factors are as follows:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered requires a special skill; (5) the degree of permanence of the working relationship; [and] (6) whether the service rendered is an integral part of the alleged employer's business.

Martin, 949 F.2d at 1293.

Defendants argue that the six-factor Economic Reality test favors an independent contractor classification. Specifically, they contend that Plaintiffs exercised significant autonomy and managerial discretion over their performances, which provided a genuine opportunity for

profit or loss.   Defendants further assert that the relationship lacked permanence or consistency, and that Plaintiffs' livestreaming services were neither integral to the business nor indicative of economic dependence.

Plaintiffs counter that the "economic reality" of the relationship is one of employer and employee.   They contend that Defendants exercised pervasive control over the livestreaming operations and that their performances—the core service provided to customers—were an integral part of Defendants' business model.   Plaintiffs further argue that they lacked any meaningful managerial discretion to affect their own profit or loss, asserting instead that they were economically dependent on Defendants' platform and infrastructure for their livelihood.

Applying the FLSA's Economic Reality test to the undisputed material facts, the Court concludes that Plaintiffs are independent contractors.

### 1.  The Economic Reality Test

### a.  The Degree of Employer's Control

The Court must determine whether the first factor—the degree of the alleged employer's right to control the manner in which the work is to be performed—weighs in favor of classifying Plaintiffs as employees under the FLSA.   "Facts relevant to this inquiry are 'the degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his or her duties.'"   Li, 2012 WL 589567, at *7 (quoting Bamgbose v. Delta–T Grp., Inc., 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010)).   This factor weighs against finding employee status when the employer exercises "minimal oversight or control" over the employee. See Donovan v. Dial America Mktg., Inc., 757 F.2d 1376, 1387 (3d Cir. 1985).

On balance, this factor weighs against finding employee status under the FLSA.   The undisputed material facts demonstrate that Defendants do not require Performers to work set

schedules or function during set business hours.   See DSMF ¶ 52; PRDSMF ¶ 52; see also ECF No. 113.8, at 3303 ("The parties agree we will not specify the hours or times when you will provide performances, and you are free to choose your own such hours and times"); Tomasello Dep. Tr. at 235:10–13 (stating similarly).

To be sure, the record establishes that Defendants do, in fact, exercise some degree of supervision and control over the manner in which Plaintiffs perform.   Streamate does have rules that every Performer must follow or risk a warning, suspension, and/or termination, and Defendants enforce these rules by maintaining active enforcement through compliance personnel who directly monitor portions of every live broadcast.   See PSMF ¶¶ 24, 29; DRPSMF ¶¶ 24, 29; see also Tomasello Dep. Tr. 41:5–20 (Plaintiff discussing Streamate suspension); 46:6–11 (Plaintiff discussing Streamate warning).   Defendants may also terminate a Performer Agreement at their discretion.   PSMF ¶ 31; DRPSMF ¶ 31.   Defendants likewise prohibit Performers from below-the-waist nudity in free chat areas, using alcohol or drugs on-camera while performing, and promoting non-Streamate websites while livestreaming on Streamate.   See PSMF ¶¶ 19, 28; DRPSMF ¶¶ 19, 28; DSMF ¶¶ 56, 68, 72; PRDSMF ¶¶ 56, 68, 72.

But Defendants' degree of supervision and control is minimal compared to the Performer's pervasive managerial and scheduling autonomy.   Performers can and do set their own prices, thereby exercising more control over their earnings and retaining the power to vet and filter their own clientele.   See DSMF ¶¶ 37, 65; PRDSMF ¶¶ 37, 65.   Streamate's compensation structure also empowers Performers to precisely evaluate the projected revenue generated by a specific broadcast prior to committing to the performance.   See id.

If Performers do commit to the performance, they retain complete discretion to stream from any private venue of their choosing, design the content of their performances, set their rates for

paid chats as well as their other performance offerings, and customize their workspace to align with their distinct stylistic preferences.   See PSMF ¶ 3; DRPSMF ¶ 3; DSMF ¶¶ 52, 55–56, 57, 61, 65, 67; PRDSMF ¶¶ 52, 55–56, 57, 61, 65, 67.   While Defendants track Performers' total minutes online and total paid minutes online, Defendants do not require Performers to clock in or out and do not fine a Performer for unreported absences or tardies.   Indeed, Performers retain absolute autonomy to take leaves of absence for days or weeks at a time entirely at will.

Furthermore, Defendants completely bypass standard onboarding employment protocols because they do not conduct interviews, review Performers' qualifications, or monitor traditional job performance metrics.   See DSMF ¶¶ 43–44; see also DSMF ¶ 22; PRDSMF ¶ 22; PSMF ¶¶ 6, 8; DRPSMF ¶¶ 6, 8.   Their onboarding oversight is strictly limited to verifying minimum age compliance, ensuring execution of the standard Performer Agreement, and confirming that the broadcast activities remain lawful within the performer's home jurisdiction.   See ECF No. 110.5, Ex. B, at 1839–40.   Beyond a baseline administrative review of the Performer's promotional biography and profile image, Plaintiffs face no mandatory consultation requirements prior to launching a live broadcast.   See PSMF ¶ 17; DRPSMF ¶ 17; see also Matter of Walsh, 168 A.D.3d 1323, 1325 (N.Y. App. Div. 2019) ("it is clear that the only control exercised by TaskRabbit was over the platform that taskers used to get jobs, not over any aspects of the jobs themselves").

Lastly, and perhaps most importantly, Performers can and do exercise control by streaming performances simultaneously on other similar platforms—including direct competitors—and advertising their Streamate activity to fans, subscribers, and potential customers.   See DSMF ¶ 56; PRDSMF ¶ 56; see also DSMF ¶¶ 68, 72; PRDSMF ¶¶ 68, 72 (noting Streamate does not restrict Performers from performing or providing content for competitor websites); see also Saleem v. Corp. Transp. Grp., Ltd., 854 F.3d 131, 141 (2d Cir. 2017) (explaining that a company

"relinquishes control over its workers when it permits them to work for its competitors," and noting that an individual able to "draw income through work for others . . . is less economically dependent on his [or her] employer").   So, while Defendants retain the standard commercial right to prohibit cross-platform self-promotion regarding non-Streamate-related accounts during the precise intervals a Performer is actively utilizing Streamate's proprietary digital infrastructure, they do not impose a general covenant of exclusivity on Performers.

Simply put, Defendants' degree of supervision and control over the specific manner, duration, frequency, or distribution of a Performer's daily streaming schedules and operational choices is nominal when balanced against Performers' pervasive managerial and scheduling autonomy.   See e.g., Walsh, 168 A.D.3d at 1324 ("By virtue of the nature of the platform, TaskRabbit exercised absolutely no control over the manner in which the taskers completed the jobs that they obtained from clients"); Matter of Hawkins v. Comm'r of Labor, 198 A.D.3d 1120, 1123 (N.Y. App. Div. 2021) ("Rover only exercises control over the platform that a provider uses to find client pet owners and not any part of the job itself, and this type of incidental control" is "not . . . control over the manner in which the providers perform their services, [or] the means used or results produced").[7]

Accordingly, this first factor weighs in favor of concluding that Plaintiffs do not constitute employees under the FLSA.

---

[7] Plaintiffs emphasize that Defendants' rules regarding their performances go beyond complying with federal, state, and local laws because Streamate has the unilateral power to terminate a Performer's live broadcast or delete uploaded media based on its own subjective determinations of appropriateness.   Although Defendants retain the unilateral discretion to deactivate a Performer's account, such an exercise of authority signifies the dissolution of a commercial contract, rather than the "firing" of an employee, as Plaintiffs assert.   See Estate of Accurso v. Infra-Red Servs., Inc., 805 F. App'x 95, 102 (3d Cir. 2020) (noting that a unilateral right to terminate can support either independent contractor or employee status depending on the broader context).   Based on the full context of the parties' relationship, the general autonomy Plaintiffs retain over their performances militates in favor of a finding that Defendants lack the requisite control needed to find an employer-employee relationship.

### b.  Plaintiffs' Opportunity for Profit or Loss

Under the second factor, the Court must determine whether Plaintiffs "faced a real opportunity for either a profit or loss in their operations, depending upon the amount of their investment and their skills in management."  Donovan, 757 F.2d at 1387.  The Court finds that this factor weighs in favor of identifying Plaintiffs as independent contractors.

It is undisputed that Plaintiffs neither "receive[ ] a bi-weekly salary of a set amount," Li, 2012 WL 589567 at *8, nor receive income from a "fixed commission," Martin, 949 F.2d at 1294. The receipt of a "bi-weekly salary of a set amount" as well as an "income derived of a fixed commission" are indicative of employee status because this suggests that there are "no meaningful opportunities for profit."  Li, 2012 WL 589567 at *8.

By contrast, under the terms of the Performer Agreement, Plaintiffs "face[ ] a real opportunity for . . . a profit [based] upon the amount of their investment and . . . management." Donovan, 757 F.2d at 1387.   Performers can set their own prices (subject to Streamate's minimum transaction amount), stream as many hours a day as they wish, select high traffic times of day to perform, increase their visibility by adding frequently searched terms to their biography, and design creative performances.  See DSMF ¶¶ 37, 52, 55–57, 61, 65, 67; PRDSMF ¶¶ 37, 52, 55– 57, 61, 65, 67; see also PSMF ¶ 3; DRPSMF ¶ 3.  Plaintiffs—not Defendants—are primarily responsible for attracting customers to their profiles and building their clientele, thereby directly impacting their take-home pay.   They are solely responsible for the environment in which they perform and the aesthetics of their performances.  See id.  Stated differently, Plaintiffs here control their potential profits.  See Luxama v. Ironbound Exp., Inc., No. 11-2224, 2012 WL 5973277, at *6 (D.N.J. June 28, 2012) (finding this factor weighed in favor of classifying the plaintiffs as independent contractors when they were not paid on a salary basis and they controlled their working hours and their profits).

Furthermore, although Streamate prohibits the promotion of competing websites during an active stream, Performers face no restrictions on marketing the platform externally on other websites and/or platforms to maximize their independent revenue. See Saleem, 854 F.3d at 143–44 (finding the plaintiffs "possessed considerable independence in maximizing their income through a variety of means" because, "[b]y toggling back and forth between different car companies and personal clients and by deciding how best to obtain business from [the defendant's] clients, [the plaintiff's] profits increased through the[ir] initiative, judgment[,] or foresight—all attributes of the typical independent contractor") (internal quotation marks omitted).

On balance, the record demonstrates Performers control the major determinants of profit, not Defendants, and can increase their income by exercising initiative and managerial skills. Accordingly, this factor weighs in favor of classifying Performers as independent contractors rather than employees under the FLSA.

### c. The Alleged Employees' Investment in Equipment

Under the third factor, the Court must analyze the alleged employee's investment in equipment or materials required for his or her task, or his or her employment of helpers. See Martin, 949 F.2d at 1293. As with the second factor, courts focus on the Performers' investment relative to that of Defendants. See Pendleton v. JEVS Human Servs., 463 F. Supp. 3d 548, 566–67 (E.D. Pa. 2020) (citations omitted); see also Luxama v. Ironbound Exp., Inc., No. 11-2224, 2013 WL 3286081, at *6–7 (D.N.J. June 27, 2013).

Unlike the previous two factors, Defendants' and Performers' relative investments weigh in favor of employee status. Undeniably, Performers must invest in a laptop, webcam, and internet access to perform on Streamate (to the extent Performers do not have these items already). See PSMF ¶ 40; DRPSMF ¶ 40; Ans. ¶ 26. Many also invest in their appearance. See Tomasello

Dep. Tr. at 135:13–19. And Defendants did not reimburse Performers for these purchases. FAC ¶ 27; Ans. ¶ 27.

But the undisputed facts and totality of the circumstances demonstrate that Defendants' corporate investments clearly outweigh Plaintiffs'. Defendants furnish Performers with seamless access to Streamate's proprietary virtual infrastructure while continuously updating and maintaining the underlying web architecture and user accounts. See ECF No. 121, at 31 ("Defendants maintain that Streamate is a unique and sophisticated livestreaming product"). Defendants employ a remote workforce complete with information technology, human resources, marketing, and compliance personnel. See PSMF ¶¶ 24, 34; DRPSMF ¶¶ 24, 34. Defendants also absorb the systemic operational expenditures, advertising and marketing costs, and administrative overhead required to keep the worldwide Streamate website and its live-streaming infrastructure functional. See PSMF ¶¶ 39, 41, 42, 43; DRPSMF ¶¶ 39, 41, 42, 43.

Consequently, this factor weighs in favor of classifying Performers as employees under the FLSA rather than independent contractors. See Verma, 937 F.3d at 231 (finding the third factor weighed in favor of employee status because a worker's nominal expenditures on personal apparel or routine gear are legally insignificant when balanced against the massive capital overhead and physical infrastructure maintained by the hiring enterprise); Galarza v. One Call Claims, LLC, 156 F.4th 1156, 1166–67 (11th Cir. 2025) (finding that the jury could weigh third factor in favor of employee status because, even though the remote workers provided workspace and equipment, including internet and computers, the company still provided necessary software, networks, and accounts).

### d. Special Skill

The fourth factor asks whether the service rendered by the alleged employee requires a special skill.   Unskilled workers are more likely to be deemed employees because "[r]outine work which requires industry and efficiency is not indicative of independence and nonemployee status." Li, 2012 WL 589567, at *8 (quoting Martin, 949 F.2d at 1295).   That said, all skilled workers are not independent contractors.   In ascertaining worker status, courts should consider whether, "in the larger picture, [workers] have the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether the skills are of the task-specific, specialized kind that form a piece of a larger enterprise, suggesting employee status."   Li, 2012 WL 589567, at *8 (citations omitted).

Granted, Performers must use discretion to cultivate a client base and stand out in a competitive market.   See DSMF ¶¶ 52, 54–56, 61; PRDSMF ¶¶ 52, 54–56, 61.   They determine where to advertise, what price point to set, when and where to work, and how to create the best workplace environment.   See PSMF ¶ 3; DRPSMF ¶ 3; DSMF ¶¶ 55, 58, 65, 67; PRDSMF ¶¶ 55, 58, 65, 67.   Additionally, some Performers wear costumes and design their performances to highlight specific talents or appeal to a particular niche.   DSMF ¶¶ 55; 57; PRDSMF ¶¶ 55; 57.

But the testimony and supporting facts on this point are particularly instructive. Performers do not need to have a specialized skill to become Streamate performers.   See Rekevics Dep. Tr. at 153:14–18; see also FAC ¶ 51 ("Performers do not have a specialized skill"); Ans. ¶ 51.   Indeed, it is not necessary for Performers to have prior experience to become Performers; they simply register to stream on Streamate.   See DSMF ¶ 22; PRDSMF ¶ 22; PSMF ¶¶ 6, 8; DRPSMF ¶¶ 6, 8; Ans. ¶ 17; see also Stevenson v. Great Am. Dream, Inc., No. 12-3359, 2013 WL 6880921, at *5 (N.D. Ga. 2013) ("Although different entertainers may possess varying degrees of

skill, there is no indication that a high degree of skill or experience is <u>necessary</u>") (emphasis added).  Upon registration, Defendants do not require Performers to complete any particularized training.  <u>See</u> DSMF ¶ 27; PRDSMF ¶ 27.  There are also no licensing or certification requirements.

Based on these circumstances, this factor weights in favor of a finding of statutory employee status.  <u>See</u> <u>Verma</u>, 937 F.3d at 231 (observing the absence of a "bright line between 'special' and other skills for purposes of our six-factor test" and affirming that attributes such as "appearance," "social skills," and "hygiene" do not constitute the type of specialized technical proficiency indicative of independent contractor status).

### e.  The Degree of Permanence of the Working Relationship

Under the fifth factor, the Court must determine the degree of permanence of the working relationship.  When addressing this factor, "courts should consider the exclusivity, length[,] and continuity of the relationship."  <u>Zanes v. Flagship Resort Dev., LLC</u>, No. 09–3736, 2012 U.S. Dist. LEXIS 22191, at *18 (D.N.J. Feb. 22, 2012) (citing <u>Martin</u>, 949 F.2d at 1295).  Generally speaking, courts give this factor minimal weight in the overall balancing analysis.  <u>See</u> <u>Verma</u>, 937 F.3d at 232.

Here, the record is devoid of any designated or implied term of employment.  Although certain Performers have maintained long-term tenures within the adult entertainment industry—including on the Streamate website—Plaintiffs retain the absolute autonomy to broadcast for alternative venues and concurrently stream on competing digital platforms.  <u>See</u> DSMF ¶¶ 56, 68, 72; PRDSMF ¶¶ 56, 68, 72.  Performers enjoy multi-platform flexibility, operating without any obligation to provide Defendants with advance notice of their schedules or availability.  This total absence of an exclusivity requirement, paired with unrestricted operational flexibility, weighs

against finding a permanent, dependent employment relationship.  See Verma, 937 F.3d at 231–32 (contrasting a traditional employer's set schedule with an open-ended, non-exclusive arrangement in affirming independent contractor status under this factor).

Consequently, because the relationship lacks the hallmarks of temporal permanence or economic exclusivity, this factor weighs against finding an employment relationship under the FLSA.

### f.   Whether the Service Rendered Is an Integral Part of Employer's Business

Finally, the Court must determine whether Plaintiffs' services are an integral part of Defendants' business.  "The critical question in assessing the integral relationship factor is the nature of the work performed by the workers: does that work constitute an 'essential part' of the alleged employer's business?   In other words, regardless of the amount of work done, workers are more likely to be 'employees' under the FLSA if they perform the primary work of the alleged employer."  Martin, 949 F.2d at 1295–96 (emphasis added).

This factor favors Plaintiffs.  Streamate is a live adult streaming platform managed by Defendants.  See PSMF ¶ 2; DSMF ¶ 2.   Performers are essential to an adults-only entertainment platform; without Performers, Defendants would cease to exist.  See Luxama, 2012 WL 5973277, at *8 (finding this factor weighs in favor of classifying the plaintiffs as employees because the plaintiffs' work constituted "an essential part of [the defendant's] business").   To find otherwise would be to ignore "the whole point of the enterprise."  Burgos v. Emperor's Tampa, Inc., 713 F.Supp.3d 1246, 1257 (M.D. Fla. 2024).

Accordingly, this factor weighs in favor of a finding an employment relationship under the FLSA.

**2.    Plaintiffs are Independent Contractors under the Economic Reality Test**

Here, three factors land on the independent contractor side of the scale (control, opportunity for profit or loss, and permanence), and three on the employee side (investment in equipment, special skill, and integral to the business).

The Court is mindful that "no one factor is dispositive."   Verma, 937 F.3d at 230.   Rather, a court should consider them together in the "circumstances of the whole activity" to determine whether the worker is "dependent upon the business to which [he or she] render[s] service" or is, "as a matter of economic reality," operating an independent business for himself or herself. Martin, 949 F.2d at 1293 (citation omitted).

Applying the federal framework here, the undisputed material evidence demonstrates that Performers operate as independent economic entities in business for themselves, rather than as dependent employees.   Except for certain guardrails set by Defendants, Performers generally exercise comprehensive control over all meaningful aspects of their work, independently dictating the specific timing, location, and manner of their broadcasts.   Furthermore, Performers actively leverage their personal business acumen to manage critical commercial operations.   This includes independently directing their own digital marketing strategies, choosing third-party advertising venues, setting individualized pricing thresholds, and selecting the distinct content features integrated into their live broadcasts.   This lack of economic dependence is fundamentally confirmed by the fact that Performers retain the absolute right to livestream concurrently on the Streamate website and alternative, stream on competing digital platform.

Accordingly, the totality of the circumstances and application of the Economic Reality test demonstrates that Plaintiffs function as independent contractors rather than statutory employees entitled to FLSA protections.   Summary judgment is granted for Defendants on Count I.

### B.    NJWHL and NJWPL Claims (Counts II-IV)

Unlike the flexible, multi-factor federal framework, the NJWHL and NJWPL command the application of the unyielding, statutory ABC test.   Hargrove v. Sleepy's, LLC, 106 A.3d 449, 453 (N.J. 2015) (answering certified question from the Third Circuit: "Under New Jersey law, which test should a court apply to determine a plaintiff's employment status for purposes of the [NJWPL] and [NJWHL]?").   New Jersey's framework establishes a robust, conjunctive presumption of employment: a worker is deemed an employee unless the hiring entity satisfies all three prongs:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his [or her] contract of service and in fact; and (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

Hargrove v. Sleepy's, LLC, 612 F. App'x 116, 118 (3d Cir. 2015) (quoting Hargrove, 106 A.3d 458) (emphasis added).

Because this test is conjunctive, an employer's failure to satisfy even a single prong is dispositive, establishing statutory employee status as a matter of law.   See Portillo v. Nat'l Freight, Inc., 606 F. Supp. 3d 72, 84 (D.N.J. 2022); Echavarria v. Williams Sonoma, Inc., No. 15-6441, 2016 WL 1047225, at *5 (D.N.J. Mar. 16, 2016).

Defendants argue that Plaintiffs are independent contractors under New Jersey's ABC test. Regarding Prong A, Defendants maintain they lack contractual or operational control over Performers, noting that requiring compliance with adult entertainment laws and broadly applicable legal mandates does not constitute employer-like control.   Regarding Prong B, Defendants assert that Performers provide services outside the usual course of business and away from any physical

place of business, emphasizing that Streamate operates as a digital gig-economy platform while Performers provide services to end-users from their own locations. Regarding Prong C, Defendants contend that Performers are independently engaged in the adult entertainment industry, maintaining distinct businesses through non-exclusive, temporary engagements under universally transportable stage names.

Plaintiffs counter that Defendants exert significant contractual and actual control over their work, thereby failing to satisfy Prong A. Under Prong B, Plaintiffs maintain that Defendants cannot meet their burden to prove either that performing is outside the usual course of Streamate's business or that such services are executed outside of all the enterprise's places of business. Furthermore, Plaintiffs argue that Defendants fail Prong C because the Performers' professional existence is entirely dependent upon, and cannot exist independently from, the Streamate platform.

Here, the unique operational structure of digital adult livestreaming platforms creates a stark legal bifurcation when evaluated under overlapping federal and state statutory frameworks. While the Economic Reality test applied to Plaintiffs' federal FLSA claim focused on the totality of the circumstances to determine economic dependence, New Jersey's ABC test utilizes a more stringent, presumptive approach.[8] Consequently, a worker may possess sufficient operational autonomy to be classified as an independent contractor under the flexible federal balancing framework, yet still fail to overcome the strict legal hurdles required to strip away statutory employee status under New Jersey law. See Hargrove, 106 A.3d at 464 ("the 'ABC' test operates

---

[8] The New Jersey Department of Labor and Workforce Development recently finalized regulations codifying a stringent regulatory posture under the NJWPL and NJWHL. See N.J.A.C. 12:11-1.1 et seq. (adopted May 5, 2026). While these rules carry a deferred operative date of October 1, 2026, and do not govern the historical claims at issue as binding regulations, they do not disrupt the Court's analysis. The statutory ABC test remains the mandatory framework enacted under N.J.S.A. 43:21-19(i)(6) and applied to state wage claims by the New Jersey Supreme Court. Because the newly adopted rules merely synthesize existing case law rather than create novel substantive burdens, the Court looks to them as highly persuasive guidance reflecting the State's established policy on worker classification.

to provide more predictability and may cast a wider net than the FLSA 'economic realities' standard"). That is the case here.[9]

Although Plaintiffs possess the operational hallmarks of independent contractors under federal law, this Court finds that they remain statutory employees under New Jersey's unyielding ABC framework. The Court addresses each prong of the ABC test in turn.

### 1. The ABC Test

#### a. Prong A: Control

The Court must first determine if Performers are "free from control or direction over the performance of such service, both under [their] contract of service and in fact." Hargrove, 612 F. App'x at 118 (citation omitted). To satisfy the "control" prong, "the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work." Hargrove, 106 A.3d at 459 (citations omitted). This is a fact-sensitive inquiry that requires the Court to evaluate all circumstances surrounding the employment relationship, including the actual performance of work. See Hargrove, 106 A.3d at 464.

Here, Plaintiffs heavily rely on the presence of the 'independent contractor' label within the governing Performer Agreement to argue that the agreement fails the contract component of

---

[9] This Court is well aware of parallel worker misclassification collective and class actions involving these same digital platform operators and adult livestream performers across other federal jurisdictions. See, e.g., Nizeul v. ICF Tech., Inc., No. 24-1393 (D. Conn. Mar. 18, 2026) (granting class certification under Connecticut's statutory ABC test). Crucially, this Court finds the recent summary judgment analysis articulated by the Middle District of Florida in Mondello v. ICF Tech., Inc., No. 24-1037, ECF No. 135-1 (M.D. Fla. Feb. 13, 2026) to be highly persuasive regarding the federal analysis presented here. See id. (evaluating the identical operational reality of the Streamate platform under the multi-factor Economic Reality test, granting summary judgment to the defendants, and holding that the plaintiffs were properly classified as independent contractors as a matter of federal law). That said, this Court's bifurcated conclusion—granting summary judgment for Defendants under the FLSA but for Plaintiffs under New Jersey law—is amply supported by the undisputed material facts, foundational state law, and recent regulatory guidance. See, e.g., N.J.A.C. 12:11; Hargrove, 106 A.3d at 453 (holding that New Jersey's ABC test governs statutory worker classification). Thus, a worker may simultaneously fail the federal economic reality test yet trigger state-law liability when an employer cannot overcome New Jersey's rigid statutory criteria. See East Bay Drywall, LLC v. Dep't of Labor & Workforce Dev., 278 A.3d 783, 793 (N.J. 2022) (citation omitted) (noting that failure to satisfy any single prong establishes an employee relationship). Accordingly, because Defendants cannot overcome the strict structural hurdles of Prong B under the ABC test, the Court holds that Plaintiffs are properly classified as statutory employees under New Jersey law and are fully entitled to the protections of the NJWPL and NJWHL.

Prong A.  This argument is a red herring that misconstrues the mechanics of New Jersey's statutory framework.   Under the ABC test, formal labels and captions carry zero legal weight; an employer cannot create an independent contractor relationship through nomenclature alone, nor does the mere presence of a contested label invalidate an otherwise compliant contract.  See Hargrove, 220 N.J. at 305 (affirming that worker classification must evaluate the substantive reality of the operational relationship rather than the superficial nomenclature or legal labels chosen by the contracting parties); see also Philadelphia Newspapers, Inc. v. Bd. of Review, 937 A.2d 318, 326 (N.J. Super Ct. App. Div. Dec. 31, 2007) ("To consider only the Agreement, and not the totality of the facts surrounding the parties' relationship, would be to place form over substance").

Instead, the contractual component of Prong A asks a singular, precise question: does the text of the agreement legally dictate that the workers are "free from control or direction over the performance of [their] service[s]"?  N.J.S.A.  43:21-19(i)(6)(A).  The text of the governing Performer Agreement answers that question in the affirmative; it explicitly strips Defendants of the right to direct Plaintiffs' broadcasting schedules, requires that Performers operate as a business independent from Streamate, and leaves all creative control over performance content to the individual Performers.  See DSMF ¶¶ 37, 52, 55–57, 61, 65, 67; PRDSMF ¶¶ 37, 52, 55–57, 61, 65, 67; see also PSMF ¶ 3; DRPSMF ¶ 3.  This is sufficient to establish that Plaintiffs were "free from control or direction over the performance of such service . . . under [their] contract[s]."  Hargrove, 612 F. App'x at 118; see also Walfish, 2019 WL 1987013, at *7–8.

In addition, the operational and substantive 'in fact' component of Prong A is similarly met because the actual relationship demonstrates that Defendants' real-world supervision is nominal when balanced against Performers' pervasive managerial autonomy and actual work performance.

Plaintiffs independently dictate their broadcasting hours, select their own creative content, and maintain absolute physical independence over their filming locations.   Consequently, performers preserve complete control over their location, content, pricing, and workspace design.[10]

Accordingly, because Plaintiffs operate free from control both on paper and in practice, Defendants have successfully satisfied Prong A.

### b.  Prong B: Course of Business or Location of Work

Defendants' success in carrying their burden under Prong A does not, however, shield them from statutory liability.   Under New Jersey law, the ABC test is a conjunctive standard. Overcoming Prong A merely unlocks the next analytical hurdles; it does not secure an independent contractor classification.   Enter Prong B.

Prong B requires Defendants to show either that the service performed by the worker is entirely outside the usual course of the hiring entity's business, or that such service is performed outside of all the places of business of the enterprise.   See Hargrove, 612 F. App'x at 118.   In a digital platform economy, an online entity's 'usual course of business' is defined not by the code running its servers, but by the specific consumer-facing services it holds out to the open marketplace.   See People v. Uber Tech.'s, Inc., 56 Cal. App. 5th 266, 296, 299 (Ct. App. 2020) (defining the defendant's usual course of business by the consumer-facing market held out to the public and concluding that the plaintiffs performed services within that usual course).

Here, the undisputed operational reality of the Streamate platform demonstrates that Defendants' entire business model is dependent on the continuous generation of web-based adult content Performers create.   While Defendants narrowly characterize Streamate as a mere "technology company," ECF No. 121, at 10, they do not simply provide software; rather, they

---

[10] See supra at IV.A.1.a.

uniquely curate, market, monetize, and profit directly from the specific livestreaming services provided by Plaintiffs, see id., at 31 (stating Streamate is a "unique and sophisticated livestreaming product"). Performers are integral to Defendants' business, rendering operations impossible without them. See People, 56 Cal. App. 5th at 295–96 ("The drivers provide the services necessary for [the] defendants' businesses to prosper"); O'Connor v. Uber Techs., 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015) ("it is obvious drivers perform a service for Uber because Uber simply would not be a viable business entity without its drivers").

Furthermore, under New Jersey law, an enterprise's 'place of business' is not bounded by brick-and-mortar walls; it extends to any proprietary digital infrastructure that serves as the primary commercial venue for the company's operations. See Portillo, 606 F. Supp. 3d at 93 ("where [the defendant] 'conducts business' necessarily extends beyond the walls of its own facilities"). Thus, an enterprise's "place of business" under Prong B includes any location where the company's core commercial services are actively being executed, meaning physical brick-and-mortar headquarters do not define the limits of the workplace. See id.; see also Devereux Found. v. N.J. Dep't of Labor & Workforce Dev., No. 0936-19, 2021 WL 2099851, at *10 (N.J. Super. Ct. App. Div. May 25, 2021) ("the analysis under [Prong] B must consider not only locations where the enterprise has a physical plant, but also where the employer conducts an integral part of the business").

The Streamate website is not a passive internet utility; it is a highly integrated, proprietary virtual workplace where customers are aggregated, financial transactions are executed, and live content is distributed and policed. The defining, if not integral, component of Defendants' commercial operations—adult live streaming—is conducted on the very website where Plaintiffs provide services. Because the digital platform functions as the indispensable commercial venue

where the business operates, the services are not performed 'outside of all places of business' of the enterprise; by logging into Streamate, Plaintiffs are effectively performing their services <u>within</u> the virtual footprint of the enterprise.

Because Defendants aggressively market a global digital library of live adult entertainment, the performers producing that content provide the indispensable lifeblood of the commercial enterprise. <u>See</u> <u>Dance, Inc. v. N.J. Dep't of Labor & Workforce Dev.</u>, No. 3035-16, 2019 WL 178473, at *2 (N.J. Super. Ct. App. Div. Jan. 14, 2019) (finding that "[the] Petitioner's argument— that the work of exotic dancers is marginal, rather than integral, to its business—is frivolous" under the ABC test).

Plaintiffs thus operate squarely within Defendants' usual course of business, meaning Defendants have failed as a matter of law to satisfy their burden under Prong B.[11]

### 2. Plaintiffs are Employees Under the ABC Test

Here, while Defendants successfully carry their burden under Prong A by establishing their operational control over Plaintiffs, they fail as a matter of law to satisfy either alternative of Prong B. Because New Jersey's statutory ABC test applies a rigid, conjunctive legal standard—a framework further illuminated by the newly adopted administrative rules under N.J.A.C. 12:11— a hiring entity's failure to satisfy any single prong is dispositive, rendering compliance with the remaining prongs irrelevant. <u>See</u> <u>Echavarria</u>, 2016 WL 1047225, at *5. Accordingly, because Defendants cannot overcome the strict structural hurdles of Prong B, the Court holds that Plaintiffs are properly classified as statutory employees under New Jersey law and are fully entitled to the

---

[11] Because Defendants have failed as a matter of law to satisfy their burden under Prong B, the Court declines to analyze Prong C. <u>See</u> <u>Portillo</u>, 606 F. Supp. 3d at 84 (citation omitted) ("Failure to satisfy any one [prong] means that a worker is an 'employee' under the [NJWPL and NJWHL]"); <u>Hargrove</u>, 220 N.J. at 305, 314 (holding the ABC test "presumes that the claimant is an employee [unless the employer can meet all three prongs] and imposes the burden to prove otherwise on the employer").

protections of the NJWPL and NJWHL.   Summary judgment is granted for Plaintiffs on Counts II-IV.

## V.    CONCLUSION

In short, applying the federal Economic Reality test, the Court finds that Plaintiffs are independent contractors as a matter of law, precluding relief under the FLSA.   However, applying the more stringent state-law ABC test, Plaintiffs qualify as employees, establishing liability on the remaining state law claims.

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 113, as to Count I and **DENIES** it as to Counts II-IV.   It further **DENIES** Plaintiffs' Motion for Summary Judgment, ECF No. 110, as to Count I and **GRANTS** it as to Counts II-IV.

An appropriate Order will follow the entry of this Opinion.

Date: 05.29.2026                              *s/ Madeline Cox Arleo*
                                              **MADELINE COX ARLEO**
                                              **UNITED STATES DISTRICT JUDGE**